# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 09-22979-CIV-MORENO/TORRES

NORBERTO FUENTES,

     Plaintiff,

                                            **ORAL ARGUMENT REQUESTED**[1]

v.

MEGA MEDIA HOLDINGS, INC. d/b/a
MEGA TV and SPANISH BROADCASTING
SYSTEM OF DELAWARE, INC., MES
PRODUCTIONS, INC., TELEMOTION
PRODUCTIONS, INC.

     Defendants.

_____/

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PLAINTIFF'S ENTITLEMENT TO ACTUAL DAMAGES AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and S.D.L.R. 7.5, defendants, Mega Media Holdings, Inc. ("Mega"), MES Productions, Inc. ("MES"), Telemotion Productions, Inc. ("Telemotion"), and Spanish Broadcasting System, Inc. ("SBS, collectively, "Defendants"),[2] respectfully submit their Motion for Partial Summary Judgment on the issue of the plaintiff's Entitlement to Actual Damages and Incorporated Memorandum of Law. Plaintiff, Norberto Fuentes ("Fuentes"), is incapable of marshaling any evidence that he sustained any actual damages in connection with his claim for copyright infringement. Summary judgment is therefore warranted.

---

[1] Pursuant to S.D.L.R. 7.1(B)(1), the Defendants have separately filed a request for oral argument.

[2] During the January 31, 2011 hearing before The Honorable Judge Torres, the Court ordered the Defendants to convert their pending Motion in Limine to Exclude Evidence on Plaintiff's Alleged Damages into a motion for summary judgment. (Statement of Undisputed Facts, ¶ 25, Exhibit T).

# I.     **INTRODUCTION**

### *The law does not concern itself with trifles*.[3]

This is lawsuit is the quintessential example of a trifling action, as there is not a scintilla of evidence that Fuentes suffered any actual damages as a result of the Defendants' alleged infringement of *Angola,* an "personal home movie," that captures Fuentes' time in Angola. Much like the fictional works that the Fuentes has authored, this lawsuit is loosely based on facts. There is one discernible fact that is true: *Maria Elvira Live,*[4] an award-winning television show broadcast on Mega TV, aired snippets of raw historical footage of events relating to the Cuba-Angola war, including images of former military leader General Arnaldo Ochoa Sanchez ("General Ochoa") and Colonel Patricio de la Guardia ("Colonel de la Guardia"), who were later executed by the Castro regime.[5]

Fuentes claims that the footage – including the scenes where he is shown in front of the camera – was either taken by him or belongs to him by virtue of his copyright registration. Fuentes further claims that *Maria Elvira Live*'s incorporation of excerpts of his raw footage,[6] has

---

[3] *See Bridgeport Music, Inc. v. Dimension Films,* 230 F. Supp. 2d 830, 839-40 (M.D. Tenn, 2002), *rev'd,* 383 F.3d 290 (6th Cir. 2004).

[4] *Maria Elvira Live* is a prime-time news-style television program, which airs nightly Monday through Friday at 8:00 p.m. on Mega TV.  The program is hosted by five-time Emmy award-winning broadcaster, Maria Elvira Salazar.  (Statement of Undisputed Facts, ¶ 6).

[5]  Presently pending before the Court is MES and Telemotion's Motion for Summary Judgment [D.E. 83], in which they move for judgment as a matter of law as the use of *Angola* constitutes a fair use, which is a complete to Fuentes' copyright infringement action.

[6]  Fuentes' claim of infringement is based on the Defendants' broadcast of images from the Works during five (5) episodes of the *Maria Elvira Live* show aired on July 14, 15, 16 and 17 of 2008 and July 13, 2009 (hereinafter, the "Broadcasts).  (*Id.* at ¶ 2, Exhibit A).

Fuentes also previously averred that the Defendants infringed his literary work, *Dulces Guerreros Cubanos* by broadcasting the still photographs contained in the book.  (Statement of Undisputed Facts, ¶ 3).  Fuentes' counsel has since *abandoned* this claim, expressly acknowledging: "It has been discovered by Plaintiffs [sic] from the taking of Maria Elvira Salazar's deposition and reviewing the shows at issue in this complaint that *Dulces Guerreros Cubanos*' [sic] was *not* utilized during the July 14, 15, 16 and 17, 2008 and July 13, 2009 broadcasts of the shows." [D.E. 42, p. 3].   Fuentes' concession that the Defendants have not used any portion of *Dulces Guerreros Cubanos,*

led to substantial damages.  This is where Fuentes' tale gets particularly interesting.  In his Rule 26 Initial Disclosures, Fuentes estimated that his damages exceeded $500,000.00.  This was figure was unadorned and unaccompanied by any explanation.  Shortly thereafter, in response to the SBS and Mega's First Set of Interrogatory Requests, Fuentes' alleged damages jumped to "in excess of $1,000,000.00."  As was the case with his Initial Disclosures, Fuentes failed to make any attempt to compute his damages.

Despite the Defendants' repeated demands, Fuentes steadfastly refused to comply with Rule 26 and his discovery obligations by explaining the "who, what, why, when and how much" of his alleged damages claims.  Instead, it was only after that became clear that Fuentes' claim for statutory damages failed as a matter of law[7] did Fuentes miraculously recall four (4) alleged lost opportunities, which in his estimation resulted in actual damages in excess of "$10,000,000." These alleged opportunities were first disclosed during Fuentes' September 24, 2010 deposition – approximately a year *after* his Initial Disclosures and less than two (2) months prior to the close of discovery.   These alleged opportunities were: (1) a lost television project with Univision; (2) another lost television project with The History Channel; (3) the publishing of an ambitious E-book; and (4) a purportedly film deal with Orlando Jimenez Leal (collectively, the "Lost Opportunities").

Contrary to Fuentes' yarn, the record evidence indisputably demonstrates that: (a) Univision was *not* interested in Fuentes' images and expressly advised Fuentes of its lack of interest; (b) that has Fuentes never had a single discussion with The History Channel; (c) Fuentes

---

ends any reasonable debate as to whether Fuentes suffered in damages in connection with *Dulces Guerreros Cubanos*.

[7] After Mega filed a Motion for Partial Summary Judgment as to Fuentes' entitlement to statutory damages ("Summary Judgment Motion"). [D.E. 20], Fuentes conceded that he was not entitled to either statutory damages or attorneys' fees.  Advised of Fuentes' concession, the Court entered an Order granting Mega's Summary Judgment Motion and holding that Fuentes was not entitled to statutory damages or attorney's fees under the Copyright Act as a matter of law. [D.E. 107].  (Statement of Undisputed Facts, ¶ 5).

has lost no profits from an E-book, which was has never been written; and (d) the proposed film deal – which was initially discussed eight (8) years prior to the alleged infringement – did not materialize due to the filmmaker's (Orlando Jiminez Leal) unrelated financial struggles.

After discovery revealed that *none* of these Lost Opportunities actually existed, Fuentes has once again gone back to the drawing board – this time, recruiting a "long-time friend," Joseph Gagen, as a putative expert witness to espouse an outlandish damages model premised on the contention that there is $20.00-per hit "legal minimum" for the unlawful posting of video clips to the cost-free YouTube website (the "YouTube™ Theory"). Gagen's YouTube™ Theory postulates that Fuentes has suffered damages in the amount of $1,000,000.00 to $1,461,780.00. [8] Until Gagen's December 17, 2010 putative expert report, which was furnished after the expert witness deadline and some fourteen (14) months after Fuentes filed this case – the Defendants never had any indication that Fuentes intended to rely on this "theory" as the basis of his damages claim. Regardless, after deposing Fuentes' "expert," it is undisputed that this "theory" does not equate to any actual damages.

Fuentes' claimed damages are unsustainable. He has absolutely no evidence to support that he was actually damaged or that the Defendants earned any profits that are directly attributable to the alleged infringement. [9] Moreover, as this Court has previously ordered, statutory damages and attorneys' fee are unavailable to Fuentes as a matter of law. [D.E. 107].

---

[8]   The defendants recently filed a *Daubert* Motion challenging both Gagen's fitness to serve as an expert witness and the soundness of his YouTube™ Theory.

[9]   It also bears noting that Fuentes is sixty-seven (67) years old. (Statement of Undisputed Facts, ¶ 15, Exhibit G). He has worked as an author his entire life. During the totality of the four plus decades that he has authored more than a dozen books. (*Id.*). From these works, Fuentes made approximately a million dollars *altogether*. [9] (*Id.*). His 2009 tax return showed *negative* income. (*Id.* at ¶ 15, Exhibit L). Fuentes has further admitted that he has made no income from either *Angola* or *Dulces Guerreros Cubanos*. (*Id.* at ¶ 15, Exhibit M). The notion that an individual, who made roughly $25,000.00 a year throughout a four decade career, has somehow suffered damages far in excess of this amount based on works that he might have made is an affront to common sense.

Fuentes' personal desire to recover money from Defendants cannot rewrite the Copyright Act. Ultimately, the analysis is simple: Fuentes' lack of any factual evidence that he suffered actual damages necessitates the entry of summary judgment in favor the Defendants.[10]

## II.   FACTUAL BACKGROUND

As required by S.D.L.R. 7.5, the facts upon which the Defendants rely in support of their Motion for Summary Judgment are set forth in its separately filed Statement of Undisputed Material Facts, and the supporting exhibits thereto (exhibits **A** through **T**).

## III.   MEMORANDUM OF LAW

### A.   The Summary Judgment Standard.

Summary judgment under Rule 56 is an integral part of the Federal Rules of Civil Procedure, which are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1.  In interpreting Rule 56, the United States Supreme Court has held that summary judgment is proper if the record evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue is 'material' if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case." *CC-Aventura, Inc. v. Weitz Co., LLC*, 2007 WL 2986371, at *1 (S.D. Fla. Oct. 10, 2007) (Huck, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Indeed, the "purpose of a motion for summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1400 (11th Cir. 1998) (internal citations omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for

---

[10]   Consequently, Fuentes is, at best, constrained to his claim for injunctive relief for his copyright action. (Statement of Undisputed Facts ¶ 4).

a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50.

Here, there is no need for trial on the issue of actual damages because there is no evidence for the jury to consider.  Judgment is warranted as a matter of law.

**B.**   **The Record Establishes Fuentes Is Not Entitled to *Any* Damages Simply Because <u>None Exist</u>.**

Pursuant to the United States Copyright Act, a copyright owner may ordinarily be entitled to choose statutory damages instead of the actual damages he suffered as a result of the infringement and any profits of the infringer that are attributable to the infringement. *See* 17 U.S.C. § 504(b). Here, neither statutory nor actual damages are available to Fuentes as a matter of law.

**1.**   <u>This Court Has Held that Fuentes Is Not Entitled to Statutory Damages</u>.

"Statutory damages" are damages specially authorized by Congress that may be obtained even in the absence of evidence of the harm suffered by the plaintiff or the profit reaped by the defendant.  *See Cable/Home Commc'n Corp. v. Network Prods., Inc.,* 902 F.2d 829, 850 (11th Cir. 1990).  Not every copyright owner, however, is eligible to seek statutory damages.  The Copyright Act expressly provides that:

> [N]o award of statutory damages or of attorney's fees … shall be made for:
>
> (1)   Any infringement of copyright in an unpublished work commenced ***before*** the effective date of its registration; or
>
> (2)   Any infringement of copyright commenced after first publication of the work and ***before*** the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412(1)-(2) (emphasis added).

The Act thus provides that statutory damages and attorney's fees are unavailable under

two independent scenarios.  First, a plaintiff cannot recover statutory damages and attorney's fees if the work is unpublished and unregistered at the time the alleged infringement commences. *See* 17 U.S.C. § 412(1).  Second, in cases where the infringement of a published work commences before registration, statutory damages are only available if registration was obtained within three (3) months of publication.  *See* 17 U.S.C. § 412(2).  *See also, Elbe v. Adkins*, 812 F. Supp. 107, 110 (S.D. Ohio 1991) ("Thus, the owner of a copyright may obtain statutory damages only by registering the copyright before any infringement, or by registering it within three months after publishing his work.").

In the instant case, the alleged infringement of the unpublished *Angola* commenced before Fuentes' registration of this work.  Fuentes was also too late in registering *Dulces Guerreros Cubanos*, which was registered almost ten years after its first publication and nearly a year after the alleged infringement commenced.  Consequently – and as this Court has ***already*** ruled – the Copyright Act's explicit text prohibits recovery of statutory damages and attorney's fees. [D.E. 107].  As set forth below, summary judgment is equally warranted on Fuentes' actual damages claims because there is no proof he suffered any losses that resulted from the purported infringement.

## 2.     It is Undisputed that Fuentes Has Not Suffered Actual Damages as a Result of the Alleged Infringement.

Within the copyright context, actual damages are measured by "the revenue that the plaintiff lost as a result of the infringement, including lost sales, lost opportunities to license, or diminution in the value of the copyright." *Thornton v. J. Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008) (internal quotes omitted). The primary measure of recovery is "the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d

1110 (2d Cir. 1986). The test for determining "market value" is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985).

Consequently, the basic rule for computing injury to the market value of a copyrighted work is to inquire what revenue would have accrued to the plaintiff but for the infringement. The plaintiff has the burden "of establishing with reasonable probability the existence of a causal connection between defendant's infringement and the loss of anticipated revenue." *Key West Hand Prints Fabrics, Inc. v. Serbin, Inc.*, 269 F. Supp. 605, 613 (S.D. Fla. 1965); *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999). Moreover, the "inherent value" of the medium in which a copyrighted work is published "is not the issue for the purpose of calculating actual damages." *Thornton*, 580 F. Supp. 2d at 1278 (rejecting argument that "inherent value" factored into actual damages calculation and explaining that market value would have been properly measured by a retroactive license fee).

Courts do not hesitate to grant summary judgment in favor of a defendant where, as here, it is undisputed that the plaintiff has suffered no provable actual damages. *See, e.g., Thornton*, 580 F. Supp. 2d at 1277 (awarding summary judgment to defendant in copyright case because plaintiff failed "to introduce any evidence, through expert testimony or otherwise," demonstrating that he is entitled to actual damages); *Fox Controls, Inc. v. Honeywell, Inc.*, 2005 U.S. Dist. LEXIS 14410, * 29 (July 14, 2005 N.D. Ill.) (granting summary judgment in favor of defendant because "[p]laintiff has not presented any evidence to create a triable issue of fact on [actual] damages" and limiting remedies to injunctive relief in copyright infringement action); *Iconbazaar, LLC v. America Online, Inc.*, 378 F. Supp. 2d 592, 594-595 (M.D. N.C. 2005) (finding that summary judgment was warranted where plaintiff offered "nothing more than mere

speculation" as to its actual damages in copyright infringement action); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 U.S. Dist. LEXIS, *134 (Oct. 27, 2010) ("Defendant is entitled to summary judgment on Plaintiff's claim for actual damages under the Copyright Act" where the court rejected the speculative testimony as to the alleged fair market value of a license fee).

Here, Fuentes is incapable of offering any evidence demonstrating that he has suffered actual damages from the Defendants' alleged infringement of *Angola*.

### a.      It is Undisputed that Fuentes Did Not Lose Any Profits as a Result of the Alleged Infringement.

A claim for lost profits can include the actual profits a plaintiff lost as a result of the copyright infringement or a retroactive license fee measured by what the plaintiff would have earned by licensing the infringing use. *See, e.g., Thornton*, 580 F. Supp. 2d at 1277. The record evidence establishes that Fuentes has no actual damages under either theory.

Fuentes' belated revelation of the Lost Opportunities notwithstanding, sworn testimony – including Fuentes' *own* sworn testimony – highlights that these Lost Opportunities are fallacious and lack any evidentiary support. During his September 24, 2010 deposition,[11] Fuentes testified:

Q:      Before the defendants' alleged infringement of Angola, did you have any offer to license the images that are contained on the videotape?

A:      What do you mean by license?

Q:      Did anyone offer to pay you money to license the images?

A:      They didn't offer to pay, but it was implicit.  I had an interest to show with The History Channel.

Q:      Is the interest from The History Channel memorialized in writing?

A:      It was a verbal agreement.  We spoke about it first.  Channel 23 or Univision.

Q:      Was the interest from Channel 23 Univision memorialized in writing?

---

[11] Fuentes' September 24, 2010 deposition was adjourned as an accommodation to his counsel, and completed on November 8, 2010.

A:     No.

Q:     Did you personally speak with the individuals from The History Channel?

A:     Yes.

Q:     Okay.  Who did you speak with at The History Channel?

A:     I don't have their name here, ***but I can look it up***.

\* \* \*

Q:     Did The History Channel tell you that they were no longer interested because of the defendants' display of images that were contained on the tape called Angola?

A:     Yes.

Q:     Okay.  And who from The History Channel advised you of that?

A:     ***The person of whom I'm going to give you the name***.

\* \* \*

Q:     Okay.  And did Univision indicate to you that in light of the episodes of Maria Elvira Live that they were no longer interested in your project?

A:     Both withdrew.

(*See* Statement of Undisputed Facts, ¶ 8) (emphasis added).

Yet, during the continuation of his deposition on November 8, 2010, Fuentes spun a different story.  This time, Fuentes testified: "***At no time did I say that I had discussions with The History Channel … Over my whole deposition, I never mentioned The History Channel***." (*Id.* at ¶ 9) (emphasis added).

During the continuation of his deposition, Fuentes further revised his prior sworn testimony and, in a complete 180, acknowledged that Helga Silva (the executive at Univision) expressly advised him that Univision was *not* interested in exploring a deal for the *Angola* footage.  (*Id.* at ¶ 10, testifying that "[Ms. Silva] told me that [*Angola*] was not for Univision.").

However, in an apparent attempt to salvage his claim, Fuentes identified Ms. Silva – who never worked at The History Channel – as his "History Channel contact" (*Id.* at ¶ 10, Exhibit G).

Specifically, Fuentes attempted to spin Ms. Silva's polite rejection into a lost opportunity, claiming that Ms. Silva was shopping *Angola* on his behalf to The History Channel. (*Id.* at ¶¶ 10-11). Under oath, Ms. Silva's flatly denied this allegation, testifying that she did not know anyone at The History Channel; never spoke to anyone at The History Channel regarding Mr. Fuentes' materials; and that not only did she never agree to pitch Mr. Fuentes' materials to The History Channel, but that doing so would have been a violation of her contract with Univision. (*Id.* at ¶ 11, Exhibit H). In one fell swoop, Fuentes' alleged damages in connection with the purported lost deals with Univision and The History Channel were defeated: as by his own sworn admission Univision rejected an opportunity to license *Angola*, and there was never so much as a single conversation with The History Channel. 2 down, 2 to go.

The alleged film deal with Mr. Leal also fails because again, according to Fuentes' own sworn testimony, the alleged deal did not materialize for reasons wholly unrelated to the Defendants' alleged infringement. Indeed, according to Fuentes, the proposed film deal with Mr. Leal was initially discussed in 2000 or 2001 – roughly eight (8) years ***before*** the alleged infringement. (*Id.* at ¶ 12, Exhibit G). Fuentes further testified that the deal stalled in 2004 or 2005 -- three years ***before*** the alleged infringement – due to Mr. Leal's unrelated financial struggles. (*Id.* at ¶ 12, Exhibit G: "That project was kind of at hold … because he had some problems … This fraud [the alleged embezzlement of a million dollars from Mr. Leal by his accountant] that was committed upon Mr. Leal had put your project on hold? That's correct.) It nonetheless bears mentioning that there is not a ***single*** document evidencing that a film deal was even discussed. There is no contract, no letter of intent and no memorandum of understanding.

In fact, there is not even a single e-mail. Just Fuentes' bare words – which, as proven above – has proven less than reliable. Regardless, Fuentes' aforementioned sworn testimony negates any alleged causal connection between the alleged film deal and the purported infringement. The alleged film deal died years before the purported infringement. 0 for 3.

This leaves the last project, which Fuentes described as the "ambitious E-book project." There is, however, no actual evidence that this project was anything more than an idea. As is the case with the supposed Leal film deal, there is no contract, no letter of intent or any actual correspondence from a publisher or literary agent. The totality of the "evidence" of the E-book project is an **unexecuted** letter that Fuentes purportedly sent to an individual named Ricardo Artola ("Artola letter"), a purported representative of an unnamed and unidentified publishing company in May of 2008. (*See* Statement of Undisputed Facts, ¶ 14). No response to the Artola letter was ever produced. Setting aside the obvious issues surrounding the authenticity of the Artola letter, the letter is by itself incapable of serving as a predicate for damages.

The Artola letter does not establish any definitive third party interest in a project involving images from *Angola*, let alone any financial terms. Then there is the additional hurdle of establishing that even if some interest did exist, the project did not materialized as a direct consequence of Defendants' alleged infringement. And, then, there is yet another hurdle that Fuentes would have to clear: proving that if there was a publisher willing to publish the E-book, the E-Book would have been profitable. Nothing of this evidence exists. "If, if, if" is simply not enough.

Simply stated, there is no evidence that an E-Book would have written, published and profitable but for the alleged infringement and the one unexecuted Artola latter is not enough to sustain a finding of actual damages.

**b.     It Is Undisputed that There is No Record Evidence of a Reasonable
License Fee.**

"In order to demonstrate entitlement to a reasonable license fee, Plaintiff must show that

the thing taken had a fair market value." *Thornton*, 580 F. Supp. 2d at 1277 (quotations

omitted).   To do so, Fuentes must demonstrate that he previously received compensation for use

of the infringed work, or submit evidence of benchmark licenses – evidence of what licensors

have paid for use of similar works. *Id.* Even where a plaintiff alleges a "lost license fee" due to

the alleged infringement, calculations of the amount of the hypothetical lost license fee cannot be

based on undue speculation. *Cf. Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769,

786-87 (9th Cir. 2006) (actual damages were not unduly speculative where plaintiff's witness

provided figures for the actual prices that plaintiff had charged for use of the copyrighted work

prior to the alleged infringement).

In *Thornton*, the court similarly analyzed an absence of evidence on lost licensing

damages in the summary judgment context.   580 F. Supp. 2d at 1277.   First, the plaintiff had

never licensed the infringed work for fees, demonstrating that the work did not have a fair

market value premised on past license fees for its use. *Id.* Second, the plaintiff failed to produce

any evidence of benchmark licenses for works similar to the infringed work.   *See id*.

Consequently, the *Thornton* court granted summary judgment because plaintiff failed "to

introduce any evidence, through expert testimony or otherwise, demonstrating that he is entitled

to lost profits, including a reasonable retroactive licensing fee." *Id.* Such is the case here.   It is

undisputed that:   (1) Fuentes was never received any offer to *Angola*, much less made any money

from licensing, and (2) there is no record evidence of any benchmark for licenses of similar

works. As in *Thornton*, summary judgment is equally warranted in this case.

To the extent that Fuentes impermissibly attempts to rely on his Supplemental Rule 26

Disclosures – submitted forty-nine (49) days after the close of discovery – as "evidence" of a lost licensing fee, the Court must soundly reject this invitation. Fuentes' Supplemental Disclosure are unproven, self-serving, an amount to nothing more than naked hypotheses unsupported by the record. As referenced above, despite purportedly being in possession of the *Angola* images since 1989, Fuentes has never monetized them. This indisputable fact belies Fuentes' contention that "he has been damaged in the amount of $350,090 to $1,000,000 for lost license fees, which allegedly "can cost anything from $100 to $10,000 per 30 seconds depending on the content." (Statement of Undisputed Material Facts, ¶ 16, Exhibit N). Fuentes' claims are nothing more than wishful thinking, and his conjecture must be rejected outright. *See Iconbazaar, LLC v. America Online, Inc.*, 378. F. Supp. 2d 592, 594-95 (M.D. N.C. 2005) (summary judgment in favor of defendant on actual damages in copyright case warranted when speculation is only "evidence" of licensing fee). Consequently, the record is devoid of any evidence of licensing fees or profits that Fuentes lost as a result of the Defendants' alleged infringement. [12]

### c. It is Undisputed that the Speculative YouTube™ Theory Does Not Constitute Actual Damages. [13]

Fuentes' putative expert witness' untenable YouTube™ Theory also demonstrates that there are no triable issues of fact for this Court to determine because this unsubstantiated hypothesis does not reflect Fuentes' actual damages.

The crux of Gagen's damages opinion is that Fuentes is entitled to $20.00 for each hit

---

[12]   Fuentes' "expert," Joseph Gagen also confirmed that there are no additional sources of actual damages. For instance, Mr. Gagen is not aware of any specific members of the public, any news station, television producer or literary publisher that lost interest in *Angola* as a consequence of the Defendants' alleged infringement. (Statement of Undisputed Facts, ¶ 17, Exhibit 0). Gagen is similarly unaware of any specific licensing opportunity or deals that Fuentes lost as a consequence of the broadcasts of *Maria Elvira Live*. (*Id.*). Asked: "[A]re you aware of any specific opportunity that Mr. Fuentes' lost as a result of Defendants' alleged infringement?" Mr. Gagen testified: "No, I'm not personally aware of that." (*Id.*).

[13]   The Defendants expressly adopt and incorporate the arguments and legal authority set forth in the Defendants *Daubert* Motion [D.E. 123], which demonstrates that Gagen is not a qualified expert, and even if he were, his findings must be stricken. Although it is impossible to determine what category of actual damages on which Gagen opines, it is irrelevant because the imaginary YouTube™ Theory cannot support any theory of actual damages.

that the *Maria Elvira Live* episodes, which contained snippets of Fuentes' alleged copyrighted received, on YouTube™.  (Statement of Undisputed Facts, ¶ 18); *see* Exhibit P, pp. 10-11). There is no methodology or rationale to Gagen's damages theory.  Instead, in opining that Fuentes has been damaged in an amount "between $1,000,000.00 and $1,461,780.00," Gagen simply multiplied the number of views, or "hits," that the clips of *Maria Elvira Live* received on YouTube™ (after being posted by a third-party blogger) by $20.00.  (*Id.* at ¶ 18, Exhibit 0, p. 72).[14]  Gagen offers no explanation for the prudence of his $20.00 per clip figure.

In fact, to the contrary, Gagen testified that, in his view, the $20.00 figure "was very cheap" and "on the low side." (*Id.* at ¶ 19, Exhibit 0, 93: "Well, I'll tell you the truth, I was thinking of much more, and I figured let me be conservative, since they've used it so many times.  I would have put $50, $100 for each time they used it.").  Despite this belief, Gagen used the $20.00 figure because it ***was provided to him by Fuentes' counsel***. (*See id.* at ¶ 19, Exhibit 0, at pp. 81-83) (emphasis added).

Gagen's self-conceived YouTube™ Theory is unfounded and does not, in any way, reflect Fuentes' Actual Damages.  YouTube™ is a video-sharing website on which users can upload, share and view videos. (*See* www.youtube.com). Most of YouTube™'s content is uploaded by individuals, although several large media corporations offer a portion of their content.[15]  YouTube™'s popularity can largely be traced to the fact that it is ***free*** to its users. Users can consume as much as YouTube™ as they wish, without paying a single penny. (*Id.* at ¶

---

[14]   Mr. Gagen's numbers are somewhat imprecise as multiplying 78,089 (the number of hits) by $20.00 nets $1,561,780.00.  Notably, Gagen did not conduct any independent analysis as to the number of hits that the *Maria Elvira Live* clips received and, instead, simply worked off on a chart furnished to him by Fuentes.  (*See* Statement of Undisputed Facts, ¶ 18, n.2, Exhibit 0, p. 72).

[15]   At the time of uploading a video, YouTube™ users are shown a screen with the message: "Do not upload any TV shows, music videos, music concerts or advertisements without permission, unless they consist entirely of content that you created yourself." (*See* www.youtube.com).

20).[16]

The number of viewer "hits" that episodes of *Maria Elvira Live* which contained Fuentes' alleged copyrighted material received on YouTube™ does not represent "the revenue that the plaintiff lost as a result of the infringement, including lost sales, lost opportunities to license, or diminution in the value of the copyright." *Thornton*, F. Supp. 2d at 1276.  Nor does each YouTube™ hit represent either: (a) "what a willing buyer would have paid to license" *Angola* or (b) the revenue that would have accrued to Fuentes but for the Defendants' alleged infringement. *Id.* at 1278.  The users who clicked on the *Maria Elvira Live* clips did so knowing that the content was free.  There is no evidence that ***any*** of these users would have proceeded to watch the clips – all of which were approximately eleven (11) minutes in length – if they knew they were going to be charged $20.00 per viewing[17] (nearly twice the amount of a movie ticket).[18]  There is similarly no evidence that any of these users – who again viewed the content for free – would have dug into their pockets and paid any money to purchase Fuentes' other projects.[19]

The number of YouTube™ hits received by the *Maria Elvira Live* clips is an unworkable proxy; fails to evidence what a willing buyer would have been reasonably required to pay to a willing seller in order to view *Angola*; and is not a reflection on the amount of revenue that

---

[16] Of note is that in reaching his calculation, Gagen did not factor in the fact that the *Maria Elvira Live* clips were ***not*** posted by the Defendants but rather by a third-party, and that it was ***the Defendants*** who had the clips removed in accordance with the terms of YouTube™ "take down" policy.

[17] To further put this in perspective, individuals can download full-length box office hits to their home television for $5.95.

[18] Despite not conducting any analysis as to the motives of the YouTube™ user, Gagen stated that the fact that these users did not pay a fee to view the video clip had no impact on his damages estimate. (*See* Exhibit 0, p. 95).

[19] On this point, it bears noting that there is absolutely no evidence or any indication that the YouTube™ postings did not actually benefit Fuentes.   The users who viewed the *Maria Elvira Live* clips may have actually been motivated to purchase Fuentes' works, as a consequence of being introduced to Fuentes and his activities in *Angola*.

Fuentes would have earned but for the Defendants' alleged infringement – a fact which, incredibly, Gagen readily concedes:

> Q:     Do you have any view of how much money that Mr. Fuentes could have made from his "Angola" video had it ... not been for the Defendants' alleged actions?
>
> Mr. Burton:   Objection to the form of the question.
>
> A:     No.  I don't know that.

(*Id.* at ¶ 21, Exhibit 0, p. 104).  The Court must summarily reject the YouTube™ Theory because it is untethered to the fair market value of clips of the Works and does not – and cannot – support any actual damages.  *See Fox Controls*, 2005 U.S. Dist. LEXIS 14410 at *28 (granting defendant summary judgment where there was "fatally vague" evidence on the fair market value of the work).

### d.     There is No Evidence that Any Profits are Not Directly Connected to the Alleged Infringement.

To obtain an award of a defendant's profits, a plaintiff bears the burden of connecting those profits directly to the purported infringement.  *See* 4 Nimmer & Nimmer, *Nimmer on Copyright* § 14.03[A] (2004) (citing *Taylor v.* Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) ("It was not enough to show [defendant's] gross revenues from the sale of everything he sold, which is all, really that [plaintiff] did.  If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.")).

*Fox Controls, Inc. v. Honeywell, Inc.*, 2005 U.S. Dist. LEXIS 14410, *25-26 (N.D. Ill. July 14, 2005) is further instructive.  In that case, the plaintiff attempted to recover the plaintiff's profits from the alleged copyright infringement by offering evidence of gross revenues.  The court explained, "Plaintiff fails to present any basis upon which to conclude that [the defendant]

derived *any* profit from the use of plaintiff's works, much less any particular amounts.  Plaintiff also fails even to argue that any particular percentage of defendant's revenues is attributable to the [infringed works]."  *Id.*  Thus, evidence of the gross revenues alone did not create a triable issue of fact on the defendant's profits resulting from the infringement, and the court entered summary judgment in favor of the defendants on actual damages.  *Id.* at *26-27.

In this case, it is undisputed that Mega, and by extension its parent company, SBS,  have not realized any profits from the Broadcasts, much less profits that are ***directly connected*** to the alleged infringement.  In 2008, when four of the five Broadcasts aired, Mega was in its nascent stages and was thus, as are all fledgling stations, a losing proposition.  (*See* Statement of Undisputed Facts, ¶ 22, Exhibit Q).  The Defendants have provided Fuentes with indisputable evidence that the production costs for *Maria Elvira Live* ***exceeded*** the revenues earned in connection with the Broadcasts – and this negative number does factor in the proportional amount of overhead or expenses (*e.g.,* rent, employee salaries, utilities and other related costs) that are attributable to *Maria Elvira Live.*   (*Id.* at ¶ 23, Exhibit R).  Mega and SBS thus did not profit from the Broadcasts. (*Id.*).

Similarly, there is no evidence that MES and Telemotion made any profits directly connected to the alleged infringement.  Mega pays MES an annual production budget for the production of a definitive number of episodes of *Maria Elvira Live*.[20]   (*Id.* at ¶ 24).   Fuentes has not proffered any evidence to establish that this annual production fee is somehow tied to any specific episodes of *Maria Elvira Live*, let alone the Broadcasts which aired *Angola.*

As in *Fox Controls*, Fuentes offers no evidence that the Defendants have garnered any profits that directly result from their broadcast of *Angola*, and he fails to make any attempt to

---

[20]    Pursuant to the contractual relationship between Mega and MES, Mega pays the annual production budget to MES, not Telemotion.   (Statement of Undisputed Facts, ¶ 24, composite Exhibit S).

apportion the revenues which would ostensibly be attributable to *Angola*. Even if the Broadcasts were profitable – which they were not – Fuentes cannot survive summary judgment. Simply stated, there are no profits directly attributable to the infringement.

## IV.   CONCLUSION

The record evidence (or lack thereof) makes it abundantly clear that Fuentes has not suffered, and is not entitled to, actual damages in conjunction with the alleged infringement of either *Dulces Guerreros Cubanos* or *Angola*. Fuentes lost neither money nor any identifiable opportunity (including any licensing opportunities) as a consequence of the alleged infringement. Accordingly, for the reasons set forth herein, the Defendants respectfully request that this Court grant its Motion for Partial Summary Judgment, precluding Fuentes' entitlement to actual damages as a matter of law.

Dated:  March 25, 2011

Respectfully submitted,

By: _s/ James G. Sammataro_           

    James G. Sammataro

    Florida Bar No. 0520292

    JSammataro@kasowitz.com

    **KASOWITZ, BENSON, TORRES &**

    **FRIEDMAN LLP**

    Four Seasons Tower

    1441 Brickell Avenue, Suite 1420

    Miami, Florida 33131

    Telephone: (305) 377-1666

    Facsimile: (305) 377-1664

    _Co-counsel for the defendant, Mega_

    _Media Holdings, Inc._

By: _s/ Raquel Fernandez_           

    Richard Dunn

    Florida Bar No.: 0126953

    Raquel Fernandez

    Florida Bar No. 055069

    **COZEN O'CONNOR**

    Wachovia Financial Center

    Suite 4410

    200 South Biscayne Boulevard

    Miami, Florida 33131-4322

    Phone: 305-704-5940

    Facsimile: 305-704-5955

    _Co-counsel for the defendant, Mega_

    _Media Holdings, Inc._

Pursuant to CM/ECF Admin. Pro. Rule 3I(3), Raquel Fernandez provided consent to the electronic execution of her signature by James G. Sammataro.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 25, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that a notice of the foregoing document is being served this day on all counsel of record identified in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF this 25th day of March  2011 to:

The Burton Law Firm
**Richard J. Burton, Esq.**
Attorney for Plaintiff, Norberto Fuentes
2999 N.E. 191 Street, Suite 805
Aventura, Florida 33180
Telephone: (305) 705-0888
Facsimile: (305) 705-0008

s/ James G. Sammataro
Attorney