# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-22979-CIV-MORENO/TORRES

NORBERTO FUENTES,

     Plaintiff,

v.

MEGA MEDIA HOLDINGS, INC. d/b/a
MEGA TV; SPANISH BROADCASTING
SYSTEM OF DELAWARE, INC.; MES
PRODUCTIONS, INC.; TELEMOTION
PRODUCTIONS, INC.

     Defendants.

_____/

# REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants MES Productions, Inc. ("MES") and Telemotion Productions, Inc.'s ("Telemotion") Motion for Summary Judgment ("Defendants' Motion") [D.E. 83] filed December 17, 2010; Plaintiff's Response in Opposition ("Plaintiff's Response") [D.E. 104] filed January 14, 2011; Defendants' Reply [D.E. 111] filed January 24, 2011; and Defendants Mega Media Holdings ("Mega Media") Spanish Broadcasting System of Delaware, Inc.'s ("SBS") Notice of Joinder [D.E. 119] filed March 18, 2011. The Court has reviewed the motion, the response, the reply, related authorities submitted by the parties, and the record in this case.

The question posed by the motion is whether the Defendants' use of various scenes from a now-copyrighted work on broadcasts of a news/public interest program cannot be deemed copyright infringement under the "fair use" statutory exception to copyright infringement codified in 17 U.S.C. § 107.  Based upon the largely uncontroverted facts in this record, we agree that the Defendants' use of the work was, as a matter of law, protected fair use under the statute.  Accordingly, the Motion for Summary Judgment should be granted.

## I.  BACKGROUND

### A.  *General Ochoa and the de la Guardias*

In 1975, Cuba entered the civil war in Angola for the purposes of spreading Marxist-Leninist ideology and utilizing Angola as a satellite country for future Cuban endeavors in Africa.  *See, e.g.,* Expert Report of Dr. Andy S. Gomez [D.E. 84] (Exhibit K) ("Gomez Report") at 5.  General Arnaldo T. Ochoa, at one time a "Hero of the Revolution" as proclaimed by Fidel Castro, was the leader of Cuban military forces in Africa throughout most of the 1980s.  *See id.*  Brothers Colonel Tony de la Guardia and General Patricio de la Guardia were also key members of Castro's regime:  the Colonel as a member of the Ministry of the Interior and the General as a commanding military officer in Africa, second only to General Ochoa.  *Id.*

The Castro regime began to view General Ochoa's increasing military power (and potentially his popularity) as problematic.  *See id.* at 6.  A "routine" background check prior to an expected announcement of General Ochoa's promotion to the head of Cuba's Western Army "began to unravel quickly."  *Id.*  Ochoa was

accused of selling diamonds and ivory he had acquired while in Angola, and his role during the Cuba-Angola conflict was called into question. *See id.* Fidel Castro accused Ochoa of engaging in side-business deals while Cuban and Angolan soldiers were fighting and dying in battle, as well as missing "crucial strategic military meetings which, if attended, could have prevented many Cuban military casualties." *Id.*

Fourteen high-level officials from Cuba's military and the Ministry of the Interior, including General Ochoa, General de la Guardia, and Colonel de la Guardia, were accused of treason, drug trafficking, and other charges. *See id.* Only portions of the trial held before a Military Honor Court were broadcast via state television to the citizens of Cuba; those portions that *were* broadcast were mainly to display "the atrocities General Ochoa and the others had committed against the state." *Id.* At the end of the trial, General de la Guardia was sentenced to a 30-year jail sentence. *Id.* General Ochoa and Colonel de la Guardia were sentenced to death for the crime of treason against the state and were executed (along with others) by firing squad on July 13, 1989. *See id.* at 7.

## B. *The Angola Videos*

The Plaintiff, Norberto Fuentes ("Fuentes"), is a well-known Cuban author and journalist who spent many years alongside Fidel Castro during the Cuban revolution. [D.E. 17] During that time, Fuentes took photographs of Fidel's brother and present head of the Cuban government, Raul Castro, and other members of the regime. He used those photographs in several books he authored. *Id.* Fuentes also

had personal relationships with General Ochoa and the de la Guardias. *See* Deposition Testimony of Norberto Fuentes, Sept. 24, 2010 [D.E. 84] (Exhibit J) ("Fuentes Depo. I") at 51-52.

Fuentes traveled to Angola approximately twenty times throughout the 1980s. *Id.* at 74. During each trip, Fuentes brought a video camera along with him, in order to take video footage of the events in Angola. *Id.* at 83. ("with my friends, [of] domestic flights in Angola, and [of] everything that I found interesting.") Over the course of these twenty trips, Fuentes accumulated approximately 10-to-12 hours of video. He ultimately left Cuba in 1994, after being labeled a dissenter from Castro's regime, and sought political asylum in the United States. *Id.* He left the tapes behind. *Id.*

Through the assistance of the Cuban Human Rights Committee, Fuentes Depo. I at 108, and an unidentified person in Canada, Fuentes regained possession and control of the Angola tapes in the United States. [D.E. 122] (Exhibit A) at 60. Between 1994 and 2008, Fuentes tried to make commercial use of the tapes. He had contacted with approximately three different parties regarding the potential marketability of his Angola videos. First, Fuentes was contacted in 2000 or 2001 by film director Orlando Jimenez Leal ("Leal"), who was personally interested in the Ochoa case and had learned of the existence of the Angola videos from the credits page on one of Fuentes' books, *Dulces Guerneros Cubanos*. *See* Deposition Testimony of Norberto Fuentes, Nov. 8, 2010 [D.E. 84] (Exhibit I) ("Fuentes Depo. II") at 33-34. Leal traveled to Miami to meet with Fuentes; the two watched

between five minutes and four hours of the Angola videos, after which Leal stated that he and Fuentes "need[ed] to make a movie with this." *Id.* at 35-36. Leal planned to make a documentary of sorts focusing on the events in Cuba in and around 1989 and leading up to the death of General Ochoa. *See id.* at 37. In 2001 or 2002, Leal visited Miami and videotaped interviews with Fuentes for the purposes of gathering footage that could potentially be used in this film project. *Id.* at 41. At one point, Fuentes sent copies of the Angola tapes to Leal for his perusal, and approximately 10 to 15 days later they were returned to Fuentes. *See* Fuentes Depo. I at 111-13**.** In 2004 or 2005, the project fell through due to Leal's having financial difficulty unrelated to this case. Fuentes Depo. II at 41.

Second, in early 2008, Fuentes had discussions with his literary agent about a potential project involving an e-book about Angola accompanied by either a DVD or by video clips embedded in the e-book. Fuentes Depo. II at 49. Fuentes sent a letter to gauge a particular publishing company's interest in the e-book, but the project has yet to come to fruition. *See id* at 52-56**.**

Finally, in May 2008, Fuentes met with Helga Silva ("Silva"), who at the time was an executive at WLTV Channel 23, the Univision affiliate in Miami, Florida. *See* Deposition Testimony of Helga Silva [D.E. 84] (Exhibit F) ("Silva Depo.") at 10. During this meeting, which took place at Fuentes' home, Fuentes played for Silva some of the clips of General Ochoa and himself in Angola. *See id.* at 12-13. Fuentes asked if Silva was interested in "doing a project with him," to which Silva replied that, although the video was of good quality, the timing and subject was not of

"immediate burning use" for a newscast on Channel 23.  *Id.* at 13.  Silva suggested that his materials may have been better suited for The History Channel, though Silva admittedly had no connection whatsoever to The History Channel.  *Id.* at 15. It is undisputed that Fuentes was never in contact with The History Channel regarding the Angola videos.  *Id.* at 16-21.

C.    ___The___ **Maria Elvira Live** *Broadcasts*

*Maria Elvira Live* is "a nightly primetime news-style television program" which airs Monday through Friday evenings on Mega TV and is hosted by Emmy-award-winning broadcaster Maria Elvira Salazar ("Salazar").  [D.E. 84]  In the summer of 2008, one of the producers of *Maria Elvira Live*, Miguel Fernandez, contacted the show's executive producer, Miguel Ferro, with the information that someone (unidentified in the record) at a company called Saks International Corporation was in possession of and interested in selling a video featuring General Ochoa and General Patricio de la Guardia in Angola.  *See* Deposition Testimony of Maria Elvira Salazar [D.E. 84] (Exhibit E) ("Salazar Depo.") at 100-03.   The producers informed Salazar that they planned to purchase the video and air it on *Maria Elvira Live.  See id.* at 106.

The broadcast of *Maria Elvira Live* on July 14, 2008, was the first to air portions of the video.  [D.E. 84]  Salazar opened that night's broadcast with a statement that the videos that were about to be seen "[had] been kept for almost 20 years by the secret services of the Cuban regime."  *Id.*

The next day, July 15, 2008, Fuentes' wife called Salazar and informed her

that the scenes *Maria Elvira Live* had played on the previous night's broadcast were taken from video recordings that belonged to Fuentes.   Salazar Depo. at 117. Salazar did not heed the rebuke:  she believed that "in Cuba the video belongs to the government and to the regime."  *Id.*  Later that day, Fuentes sent a note via fax to several producers at *Maria Elvira Live* that stated, in part, "I have the copyrights . . . over the videos which Mrs. Salazar is presently showing in her daily TV program *Maria Elvira Live*.  Please immediately discontinue showing the videos." [D.E. 17]

Despite this denial of permission by Fuentes, clips from the videos were aired on *Maria Elvira Live* that night, as well as the following two nights.  [D.E. 84] During each night's broadcast, Salazar analyzed, discussed, and commented on the various clips with guests who appeared on her show.  *Id.*  A 30-second clip was also aired on the July 13, 2009, broadcast, when *Maria Elvira Live* commemorated the 20th anniversary of the execution of General Ochoa.  *Id.*

### D.    *The Current Litigation*

Fuentes registered two hours of his Angola video clips, entitling the compilation *Angola 1988/1989* ("*Angola*"), with the Register of Copyrights on May 18, 2009, ten months after clips were first broadcast on *Maria Elvira Live*.  [D.E. 17].  Fuentes then proceeded to file a Complaint against Mega Media and SBS on October 2, 2009, alleging copyright infringement in violation of the Federal Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, unauthorized publication of name or likeness in violation of Fla. Stat. § 540.08., and common law invasion of privacy.

[D.E. 1]  Chief Judge Federico A. Moreno granted Mega Media and SBS' Motion to Dismiss Counts 2 and 3 of the Complaint for failure to state a claim upon which relief could be granted on June 30, 2010.  [D.E. 14]

Fuentes filed an Amended Complaint on July 20, 2010, against Mega Media and SBS (adding MES and Telemotion, as well) (hereinafter collectively "Mega" or "Defendants") alleging only copyright infringement. [D.E. 17].   The litigation proceeded and the parties engaged in extensive discovery.

MES and Telemotion filed this Motion for Summary Judgment on December 17, 2010, [D.E. 83] claiming that:  (1) Fuentes is not entitled to the copyrights for the scenes in *Angola* in which he appears on camera (the "On-Screen Scenes"), because he cannot be considered the "author" of those scenes as a matter of law; (2) the use of the remaining scenes from *Angola* on broadcasts of *Maria Elvira Live* cannot be considered copyright infringement, because the use falls squarely under the "fair use" statutory exception to copyright infringement codified in 17 U.S.C. § 107; and (3) this case "involves discourse of public importance broadcast on a news program," and thus First Amendment considerations compel a finding that MES and Telemotion's actions are not copyright infringement.

Fuentes filed his Response [D.E. 105] on January 14, 2011, claiming that:  (1) Fuentes is the one true owner of *Angola*, as the videos were recorded on his video cameras either by him or at his behest; (2) the Defendants cannot meet their burden to prove that their use of *Angola* was fair; and (3) the Defendants' First Amendment

rights "should not give them the right to trample Fuentes' copyright and ability to earn a living."

Mega Media/SBS filed Notice of Joinder on March 18, 2011, joining in MES and Telemotion's pending Motion for Summary Judgment, and claiming that if summary judgment is granted as to MES and Telemotion, then Fuentes' claim of vicarious infringement against Mega Media/SBS fails as a matter of law.  [D.E. 119]

The Court now addresses the Defendants' Motion for Summary Judgment [D.E. 83], which is dispositive of this case.[1]

## II.  ANALYSIS

**A.**  ***Summary Judgment Standard***

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is

---

[1] Other dispositive motions were also filed, including a Motion to Exclude portions of Fuentes' expert report and his accompanying testimony [D.E. 122] and a Motion for Partial Summary Judgment on Plaintiff's Entitlement to Actual Damages [D.E. 124].  Those motions will be deemed moot in light of this Report and Recommendation addressing only the earlier substantive Motion for Summary Judgment filed December 17, 2010 [D.E. 83].  And because the fair use issue is so compelling, this Report and Recommendation will not address the other two arguments raised in that motion.  We thus assume for present purposes that Fuentes is entitled to ownership over all scenes of the copyrighted work, including those in which he is a subject and not the photographer.

indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).   It is required that "the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 321, 324 (internal quotations omitted).   Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.   *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## B.   *Fair Use*

It is well understood that "copyright does not immunize a work from comment and criticism." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d, 1257, 1265 (11th Cir. 2001) (emphasis in original).   The fact that Fuentes holds the copyright to *Angola* and registered it with the Register of Copyrights does not make Mega's use *per se* unlawful.   Mega does not dispute that the broadcasts of *Maria Elvira Live* at issue took place or that those broadcasts were unauthorized by Fuentes.   Nevertheless, Mega's appropriation of scenes from *Angola* may not constitute infringement of Fuentes' copyright if the taking is protected as a "fair

use."[2]  An opportunity for a defendant to claim a fair use of copyrighted materials has long been thought necessary to fulfill the purpose of copyright, as it was outlined by the Constitution:  "[t]o promote the Progress of Science and the useful Arts . . . ." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8).

Fair use remained an exclusively judge-made doctrine until the passage of the 1976 Copyright Act, which codified the doctrine:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes of criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement of copyright*.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1)  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)  the nature of the copyrighted work;
>
> (3)  the amount and sustainability of the portion used in relation to the copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the copyrighted work.

---

[2] Again, although Mega *does* dispute whether Fuentes validly owns the copyright to all of the scenes in *Angola* that Fuentes registered for copyright [D.E. 83], fair use's status as a complete affirmative defense to a claim of copyright infringement makes a discussion of that dispute unnecessary.  17 U.S.C. § 107.  The logic is simple:  if all of the scenes from *Angola* that Mega used are determined as falling under fair use, then such a determination would include the scenes over which Mega disputes Fuentes' copyright interest.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all above factors.

17 U.S.C. § 107 (emphasis added).

The fair use doctrine "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks and citation omitted)). "The task is not to be simplified with bright-line rules," for the copyright statute, like the fair use doctrine it recognizes, calls for a case-by-case analysis. *Campbell*, 510 U.S. at 577 (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448 and n. 31 (1984)) (other citations omitted).

The fair use doctrine is an "equitable rule of reason." *See Peter Letterese & Associates, Inc. v. World Institute of Scientology Enters.*, 533 F.3d 1287, 1308 (11th Cir. 2008) (quoting *Stewart*, 495 U.S. at 236-37) (other citations omitted). In assessing whether a use of copyright is a fair use under the statute, the Court bears in mind that the examples of possible fair uses given in the statute are illustrative rather than exclusive, and that "[a]ll four of the factors are to be explored, and the results weighed together, in light of the purposes of copyright." *Suntrust Bank*, 268 F.3d at 1268 (citation omitted).

The question of fair use constitutes a mixed issue of law and fact. *See Harper & Row*, 471 U.S. at 560. Nevertheless, fair use may be decided on summary judgment. *See Peter Letterese*, 533 F.3d at 1319; *Cable/Home Comm'n Corp. v.*

*Network Prods., Inc.,* 902 F.2d 829, 845 (11th Cir. 1990).  "If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work."  *Worldwide Church of God v. Philadelphia Church of God, Inc.*u, 227 F.3d 1110, 1115 (9th Cir. 2000) (citing *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1150-51 (9th Cir. 1986).  Thus, the Court will discuss each of the four factors outlined in the statute in turn.

### 1.    *Purpose and Character of the Use*

The Court must first consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1).  The inquiry requires a determination of whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is of the type that actually tends to advance copyright's goals of promoting "the Progress of Science and the useful Arts."  *See Fitzgerald v. CBS Broadcasting, Inc.*, 491 F. Supp. 2d 177, 184 (D. Mass. 2007) (citation omitted).  In order to make this determination, courts typically ask four questions.  The first question is whether the defendant's use of the copyrighted material falls into one of the categories enumerated by Congress.  *See* 17 U.S.C. § 107.  The second question is whether the defendant's use was "transformative"—i.e., "whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying."  *Fitzgerald*, 491 F.

Supp. 2d at 184.   The third question is whether the defendant's use was commercial—whether it served defendant's private interests rather than the public interest in the copyright law.   *Id.*   The final question is whether the defendant acted in good faith when it used the copyrighted material.   *See* 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 13.05[A], at 13-72 (1995) (hereinafter Nimmer).

**(a)     Does Mega's use of *Angola* fall into one of the enumerated categories under the copyright statute?**

First, the Court must determine whether Mega's broadcasting of *Angola* on *Maria Elvira Live* falls into one or more of the statutory categories: "criticism, comment, news reporting, teaching . . ., scholarship, or research."   17 U.S.C. § 107. Mega claims that the broadcasting falls under three of those categories:   news reporting, as well as encouraging criticism and comment on a historically significant event.   [D.E. 83]   Mega asserts that the purpose of *Maria Elvira Live* promotes the dialogue on important, newsworthy events happening in the Spanish speaking world, especially given its location in South Florida and one of its primary demographics being Cuban-Americans.   Fuentes rebuts Mega's assertion by stating that *Maria Elvira Live* is not a news reporting show but is, in fact, "a controversial show, focusing on discussing politic[al], social, and economic issues, similar to the O'Reilly Factor . . . ." [D.E. 104].   Frankly, we see little distinction in Fuentes' comparison of a pure news reporting show and a "controversial" show about political, social and economic issues.   Whether one type of show is bland or factual while another is more provocative or viewpoint-driven does not make the topic at issue any less "newsworthy" for fair use purposes.   To the contrary, the latter news

program may promote the very type of "criticism" and "comment" that the statute addresses by name.

Mega points us instead to cases like *Monster Communications, Inc. v. Turner Broadcasting Systems, Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996), in support of the particular proposition that the use of factual footage of "figure[s] of legitimate public concern" can weigh in favor of fair use. Mega's expert, Dr. Gomez, states that the actions of General Ochoa and General de la Guardia "are of historical significance to the Cuban population, particularly the Cuban exile community," especially given the fact that the "true story" regarding what really happened to General Ochoa has not been told. Gomez Report at 7. Ochoa is believed by many Cuban exiles to have been executed because of his popularity among other members of the Cuban military, because he was working with Mikhail Gorbachev to ensure the end of Communism in Cuba, or because Fidel and Raul Castro were perhaps complicit in the crimes alleged against Ochoa. *Id.* at 7-8.

The common portrayal of Ochoa is that he was a "Cuban hero who was wrongly put to death by a kangaroo court." *Id.* at 8. However, the *Angola* videos reveal that Ochoa, de la Guardia, and the other military leaders may not have been as fine and upstanding as originally thought. Gomez cites two scenes in particular:

> The images of General Ochoa sunbathing by the pool and engaging in sexually-charged behavior reveals an air of indifference—an attitude one would not typically equate with a military leader on foreign soil during a time of war. Further contributing to the impression of General Ochoa's cavalier attitude is a segment in which he and other military leaders are ostensibly laughing at General Leopoldo "Polito" Cintra Frias' request for air support for his troops fighting in the southern part of Angola. The image of General

> Ochoa ridiculing a request that likely resulted in the death of Cuban soldiers is particularly startling . . . .

*Id.* at 8.  Salazar described yet another scene displaying Ochoa throwing a Rolex watch into a pool and joking about it with the other officers—"that goes to show how they could have material possessions that the rest of the Cuban population doesn't have access to, because the Role[x] was given to him by Fidel."  Salazar Depo. at 148.

Fuentes does not dispute the historical significance and news value of the *Angola* scenes.  To the contrary, his own expert points out the work's value in providing a "unique insight into a historical event that impacts the diplomatic relations between countries such as Cuba, United States, the Soviet Union, Angola and South Africa." [D.E. 122-2] (Expert Report of Joseph Gagan at 9).

In light of this, there can be little doubt that General Ochoa is a "figure of legitimate public concern," *Monster*, 935 F. Supp. at 494, to the viewers who regularly tune into *Maria Elvira Live*.  There can likewise be little doubt that the "inside look," so to speak, that the *Angola* scenes allowed viewers to take into Ochoa's private life is a subject of Cuban-exile interest.  *See* Silva Depo. at 31 (confirming that other stations—or, in her words, "everybody"—spoke of the anniversary of Ochoa's death as it approached).  The potential corruption of the Cuban regime seems like an issue ripe for debate, criticism, and comment.  *Maria Elvira Live* capitalized on that by inviting experts to discuss, analyze, criticize, and comment on the clips along with Salazar.  Just because a television host and her guests used copyrighted images to assist in a discussion of issues that could be

considered "controversial," [D.E. 104], does not necessarily bar that discussion from being considered "news reporting," as well.

Fuentes argues that in 2008 and 2009, "*Angola* is not newsworthy." [D.E. 105] "News reporters tend to focus on what's happening this day, this hour, this minute, not something that happened over 20 years ago." *Id.* This argument is fundamentally flawed as, in essence, if the Court were to accept it as true, it would severely weaken Fuentes' later argument (discussed in § II.B.4, *infra*) that there is a large potential market that was adversely affected as a result of the *Maria Elvira Live* broadcasts. *Id.* Fuentes faces a dilemma: either *Angola* is *not* newsworthy and thus there is *no* market that could have been damaged by Mega's use, or *Angola is* newsworthy and thus there *is* a market that could have been damaged by Mega's use. He cannot have it both ways.

Mega believed at the time that it was reporting breaking news—they had only recently acquired the video, *see* Salazar Depo. at 106, and once they realized what they had, they disseminated it to the public as quickly as possible.[3] And, after viewing the broadcasts, a reasonable trier of fact could not dispute that what transpired in front of, during, and about the scenes from *Angola* was criticism and

---

[3] Salazar opened the July 13, 2008, broadcast (the first *Maria Elvira Live* broadcast to display scenes from Angola) with "Hello—greetings for all on this night of great revelations on *Maria Elvira Live*. We start the week with a special series that uncovers one of the best kept secrets of the Castro regime: the life of General Arnaldo Ochoa. The videos you will exclusively see tonight have been kept for almost 20 years by the secret services of the Cuban regime. Never before, never before, have they been presented to the public for viewing." [D.E. 83] (as translated by Defendants). This further contributes to a finding that, as a matter of law, what was shown on the show *at the time of the broadcast* was news reporting.

commentary—of Ochoa and de la Guardia, of the war in Angola, and of Castro's regime—sufficient to satisfy the demands of the statute.

**(b)    Was Mega's use of *Angola* "transformative"?**

The inquiry into whether a use is "transformative" centers on "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (Story, J.)).   Although transformative use is "not absolutely necessary for a finding of fair use . . . the goal of copyright . . . is generally furthered by the creation of transformative works. Such works lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright . . . ." *Campbell*, 510 U.S. at 579 (citing *Sony*, 464 U.S. at 478-80 (Blackmun, J., dissenting)).

Fuentes relies heavily on *Fitzgerald* in his argument that Mega's use cannot be viewed as transformative.   [D.E. 105] at 10-11.   In *Fitzgerald*, a freelance photographer brought a copyright action against CBS for its unauthorized broadcast of photos he had previously taken of a notorious gangster.   491 F. Supp. 2d at 179.   Although the court did ultimately find that CBS's use was not transformative and thus the factor weighed against fair use (all CBS did was crop out part of the original photograph and broadcast it as part of a different, yet still related, news story), it did take note of the fact that all reuse of copyrighted material occurs in a different context from the original use, and in some way

changes the source material:  "there is no bright line marking the point at which this change is sufficient to become 'transformative.'"  *Id.* at 185; *compare Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 12, 22-23 (1st Cir. 2000) (holding that a posed photograph of a model that was originally intended to be a part of her portfolio later being published in a news story about her participating in a beauty contest *was* "transformative") *with Los Angeles News Serv. v. Reuters TV Int'l*, 924 F. Supp. 1265, 1273 (C.D. Cal. 1996), *aff'd in part, rev'd on other grounds*, 149 F.3d 987, 993 (9th Cir. 1998) (holding that the retransmitting of news videos of the 1992 L.A. riots without comment, editing, or context was *not* "transformative").

Mega's broadcasting of the *Angola* scenes was not "merely the product of the 'facile use of the scissors'" that Justice Story warned against in *Folsom*.  9 F. Cas. at 345.  Even in the light most favorable to Fuentes, this was no mere cut-and-paste job:  it was Mega who "instilled the raw images" that Mega claims constitute *Angola* "by placing them in context and providing narrative explanation."  [D.E. 83]  Silva stated that part of the reason she passed on forwarding *Angola* to Univision was because "[y]ou couldn't just play it by itself . . . you'd have to be very explicatory unless you are a buff of . . . Cuban history specifically of that particular time."  Silva Depo. at 29.

Mega did not merely retransmit portions of *Angola* without comment, editing, or contextualizing the images, just as the defendant did in *Los Angeles News Service*.  924 F. Supp. at 1272-73.  And Mega did much more than merely re-run the videos in a different context, akin to the newspaper that ran the model's portfolio

photograph in a news story—an action that *was* held to be transformative. *Nuñez*, 235 F.3d at 22-23. Mega selected which scenes out of the hours of video they would broadcast during the show on each particular night and invited guests onto the show that could (and did) provide insight into and commentary on those scenes. [D.E. 111].

Fuentes' sole rebuttal argument on this point ("while several people made comments about the content contained in the video, it was not made by Defendants, the ultimate infringers in this case") is quite unpersuasive. [D.E. 105] First, it goes without saying that a person who seeks to utilize another's work in fair use did not "make" the infringed work. If that were dispositive the fair use exception would be a nullity. But it is not. Second, Mega's copyrighted ownership of its own work—the entire broadcast—includes the comments and criticisms of its own employees as well as any of the guests who were interviewed in the broadcasts. Thus, either way one looks at it Fuentes' attempt to discount the transformative nature of Mega's contribution to the Angola story falls flat.

This factor focusing on the transformative nature of work generated from another is a quintessential part of the fair use analysis. And based upon the undisputed  nature of the record here, it strongly favors Mega's position because Salazar took an active role in the discussion and commentary during the broadcasts as not only the host of her namesake show, *Maria Elvira Live*, but also as the President (and therefore prime agent) of MES and Telemotion (which Plaintiff took

special care to bring to the Court's attention [D.E. 104] at 5 n. 4), both of which *are* Defendants in this suit.

Taking all of the above into account, there can be no issue of material fact that the Defendants' use of *Angola* was indeed "transformative" even though Defendants had no role in the creation of the raw video.

**(c)    Was Mega's use of *Angola* commercial?**

Having found as a matter of law that Mega's use was transformative, the Court must keep in mind that, although "transformative use is not absolutely necessary for a finding of fair use . . . the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.  In determining whether a use was "commercial," courts ask "to what extent a defendant's use promotes only the defendant's own private interests." *Fitzgerald*, 491 F. Supp. 2d at 186; *see also MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981).

Fuentes argues that, because MES is paid under a contract to produce *Maria Elvira Live*, and because the goal of the show is to turn a profit, then the defendant's infringement is necessarily barred from being viewed as anything but commercial.  [D.E. 105]  However, many of the uses § 107 identifies as examples of fair use—including criticism, comment, and news reporting—"are generally conducted for profit in this country." *Harper & Row*, 471 U.S. at 592 (Brennan, J., dissenting).  "To negate any argument favoring fair use based on news reporting or criticism because that reporting or criticism was published for profit is to render

meaningless the congressional imprimatur placed on such issues." *Id.* The Supreme Court later adopted as its own Justice Brennan's point in *Campbell*, adding that "[n]o man but a blockhead ever wrote, except for money." 510 U.S. at 584 (quoting 3 Boswell's Life of Johnson 19 (G. Hill ed. 1934)).

Fuentes claims that the commercial nature of Mega's use of the *Angola* clips "militates quite strongly against a finding of fair use," [D.E. 105] (citing *Sony*, 464 U.S. at 451), and particularly focuses on the quote from *Sony* that "every commercial use of copyrighted material is presumptively . . . unfair." 464 U.S. at 451. This argument is out-dated and ignores overriding precedent. Justice Souter criticized Fuentes' exact "elevation of one sentence from *Sony* to a *per se* rule," in *Campbell*, stating that that elevation "runs as much counter to *Sony* itself as to the long common-law tradition of fair use adjudication. Rather, as we explained in *Harper & Row*, *Sony* stands for the proposition that the 'fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.'" 510 U.S. at 585 (citing *Harper & Row*, 471 U.S. at 562).

"The fair use privilege has been applied without question to other publications which have obviously been motivated in part by a desire for economic gain." *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966) (citing *Holdredge v. Knight Publ'g Corp.*, 214 F. Supp. 921 (S.D. Cal. 1963) (article in popular magazine)) (other citations omitted). Consequently, this consideration does not help Fuentes' case that the work in question cannot be deemed a fair use under § 107.

**(d)    Did Mega act in good faith in their use of *Angola*?**

The final consideration relevant to the character and purpose of the use is "the propriety of the defendant's conduct."  Nimmer, § 13.05[A], at 13-72.  "Fair use presupposes 'good faith' and 'fair dealing.'"  *Time, Inc. v. Bernard Geis Associates*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (quoting Schulman, *Fair Use and the Revision of the Copyright Act,* 53 Iowa L. Rev. 832 (1968)).

In evaluating character and purpose, the Supreme Court in *Harper & Row* considered an infringer's knowing exploitation for economic profit of copyrighted material, which was obtained in an underhanded manner, when it analyzed the defendant's "scooping" of the unpublished manuscript of former President Gerald Ford.  471 U.S. at 562-63; *see also New Era Publ'ns Intern., ApS v. Carol Publ'g Group*, 904 F.2d 152, 156 (2d Cir. 1990).  That consideration weighed against a finding of fair use:  the defendant's use "had not merely the incidental effect but the *intended purpose* of supplanting the copyright holder's commercially valuable right of first publication."  471 U.S. at 563 (emphasis in original).

In stark contrast, there is no "intended purpose" in this case.  This case does not involve "an attempt to rush to the market just ahead of the copyright holder's imminent publication."  *Salinger v. Random House, Inc.*, 811 F.2d 90, 96*, opinion supplemented on denial of reh'g*, 818 F.2d 252 (2d Cir. 1987).  Mega's conduct bears no similarity to the sharp practices condemned in *Harper & Row*, where "The Nation knowingly exploited a purloined manuscript."  471 U.S. at 563.

Despite this, Fuentes makes a bare conclusory accusation—"his video was acquired by unlawful means," [D.E. 105], at 13—and only attempts to substantiate it by stating that he is "uncertain how any person was able to obtain a copy of his personal home movie that he held in isolation since he has resided in the U.S." Fuentes Depo. I at 110. By Fuentes' own admission, however, he did not arrive in the United States with the *Angola* videos in his possession. [D.E. 122] (Exhibit A) at 60. Furthermore, the videos were out of his possession when he sent them to Leal for Leal's perusal in pursuit of their planned (but ultimately scrapped) film project. Fuentes Depo. I at 111-13. The tapes may have been loaned to others, as well: Fuentes said he could not recall whether or not he had, but it was possible that he had. *Id.* at 104.

The Court certainly must scrutinize what actions the Defendants took in acquiring the video—even though Fuentes did not—to determine whether there is any genuine issue of fact as to whether the acquisition was made in good faith. Salazar stated that the producers of *Maria Elvira Live* called her and told her that a man had come to the studio and offered them the video, "and we said fine, because we know the video belongs to the Cuban regime." Salazar Depo. at 107. The producers were extremely interested in purchasing the video, so they called Salazar's secretary, who issued the check for $1500 in order for them to purchase it. *Id.* at 116.

When asked by Fuentes' counsel to elaborate on her opinion that the video could not belong to any one particular person, Salazar replied:

> I know how things work in Cuba, and in Cuba you do not have private property. No one owns anything in Cuba, and much less a material with this content where you have images of Ochoa and de la Guardia talking such highly-charged military importance or strategies that could be owned by any one individual.

*Id.* Fuentes' counsel then asked, if what she had just stated was true and the Cuban regime owns the video, how was it possible that the seller obtained it? *Id.* at 131. Salazar answered:

> You have a lot of people that are generals and that are soldiers and they work for the Cuban military. They are in Cuba. They know that that material is extremely sensitive, and *denouncia*—and denounce the excesses and the horrible things that the Cuban regime as done to the Cuban people.
> So what those people do is they subtract it or take it or make a copy from the national archives or from (speaking Spanish), which is the repressive *federales*. The repressive *federales* like the Gestapo in Germany, they had archives where we are—we journalists, we are anxious to get a hold of, just like when democracy came to East Germany, then the new government opened the archives and showed it to the world.
> So what's happening right now is those archives are trickling down out of Cuba, trickling down or being smuggled little-by-little.

*Id.* at 131-32. Salazar further testified that one of the guests who came on *Maria Elvira Live* that week, Delfin Fernandez, informed her that the video was also used during General Ochoa's trial. *Id.* at 148-49. Finally, she reported that she was aware that Channel 41 had also purchased the video or its content and that she knew "that the material is available in video stores in Hialeah . . . . [Y]ou can go to any video store in Hialeah and you can ask for the Ochoa material." *Id.* at 179.

Although the identity of the man from "Saks International" remains unknown, the discussion above is sufficient to find that there is no genuine issue of fact that the copy of the video ultimately used on *Maria Elvira Live* was purchased

by Mega from a third party (in good faith), and not stolen by Mega from Fuentes, or absconded with through some other bad faith means.   *See Wright v. Warner Brooks, Inc.*, 953 F.2d 731, 737 (2d Cir. 1991); *cf. Harper & Row*, 471 U.S. at 563 (discussing *knowing* exploitation of a purloined manuscript as an example of bad faith behavior).   This is particularly so when combined with the admitted fact that Fuentes did not have possession of the video when he left Cuba, and then after re-obtaining the video *at least* once for a period of nearly two weeks.   These were all periods when others could have obtained copies of the video, which ultimately landed at Mega's doorsteps without the knowledge that Fuentes had any interest in the video.   The record fully supports Mega's good faith position, and at the very least Fuentes has not provided any record evidence from which a reasonable jury could draw any different conclusion.

Fuentes makes an argument in the alternative that, even if Mega acquired the video in good faith, because Mega continued to broadcast *Angola* after he informed them they were infringing on his copyright, they then acted in bad faith. [D.E. 105]   The Supreme Court addressed and rejected this very same type of argument:   "If the use is otherwise fair, then no permission need be sought or granted.   *Thus, being denied permission to use a work does not weigh against a finding of fair use.*"   *Campbell*, 510 U.S. at 585 n. 18 (citing *Fisher v. Dees*, 785 F.2d 432, 437 (9th Cir. 1986)) (emphasis added).

**(e)     Conclusion as a matter of law on the first factor.**

Based on the foregoing discussion of the different questions to consider, the first factor in the fair use analysis—the purpose and character of the use—cuts strongly in favor  of Mega, although it does not "necessitate a finding of fair use." Nimmer § 13.05[A][1][a] at 13-161 to 162; *see also New Era Publ'ns Intern., ApS v. Henry Holt & Co.*, 873 F.2d 576, 583 (2d Cir. 1989).  We turn then to the next question.

## 2.     *Nature of the Copyrighted Work*

The second fair use inquiry requires the Court to consider "the nature of the copyrighted work."  § 107(2).  Most often this is a matter of a court determining whether the copyrighted work at issue is factual or creative, because, in general, fair use is more likely to be found in factual works than creative works.  *See Campbell*, 510 U.S. at 586 (citing Nimmer § 13.05[A] at 13-77 to 78 ("[A]pplication of the fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or fantasy.")); *cf. Harper & Row*, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").

Fuentes argues, again quite unpersuasively, that *Angola* is an artistic work, and is therefore "entitled to the greatest degree of protection."  *Suntrust Bank*, 268 F.3d at 1271.  He claims that, "[b]y making the ultimate decision to film a particular event," he "retained artistic control over the composition of the video." [D.E. 105] at 14.  Mega, of course, disputes that and states that the broadcasts are

"indisputably factual and barely—if at all—clear the needed quantum of originality to be copyrightable in the first instance."  [D.E. 83] at 17.  We agree with Mega because the undisputed record evidence in this case points only to the conclusion that this is a factual work.

Keeping in mind the fact that "creativity for the purposes of fair use is more difficult to establish than mere threshold copyrightability," *Fitzgerald*, 491 F. Supp. at 188; *cf. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 ("[O]nly minimal authorial control is necessary to make a work *copyrightable* at all."), the Court finds a comparison of two previously mentioned cases to be quite instructive in a discussion of this factor.  In *Los Angeles News Service*, 942 F. Supp. at 1273, videos taken on the scene of the L.A. riots were held to be factual works for the purposes of fair use.  Those videos involved the selfsame authorial choices Fuentes claims he made in *Angola*—framing, angle, timing, lighting, etc.  That is, of course, giving Fuentes the benefit of the doubt.  It would be entirely accurate to state that he had even *less* authorial control than that, when, by his own admission, he stated that he recorded simply, "everything [he] found interesting."  Fuentes Depo. I at 83.

In contrast, in *Nuñez*, 235 F. 3d at 23, despite the fact that the photographer posed the model; that he chose her clothing, make-up, and hairstyle; that he arranged lighting and backdrop; and that he gave her instructions on facial expressions—all choices that Fuentes certainly did not make in *Angola*—the court *still* found that the "pictures could be categorized as *either* factual or creative" because they "were not artistic representations designed primarily to express [the

photographer's] ideas, emotions, or feelings, but instead a publicity attempt to highlight [the model's] abilities as a potential model." (emphasis added).

Here, Fuentes exercised no more than the minimum authorial decision-making necessary to make a work copyrightable under *Feist*.  While resourceful, Fuentes' being so well-connected to Cuba's military elite—and being fortunate enough to have made twenty trips between Cuba and Angola as a guest of this elite—is not a creative process for the purposes of the fair use doctrine; the videos are undeniably factual works.  *See Fitzgerald*, 491 F. Supp. at 188.  After all, Fuentes seeks to profit from their display due to their historical importance, not because of the photographic quality of the film or the lighting used in the jungles of Angola.

Having determined that the videos are indeed factual works as a matter of law, it is understood that the exclusive ownership of facts does not promote the Progress of the useful Arts.  *See, e.g., Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501, 509 (2d Cir. 1984).  If Fuentes is the only one with access to the facts contained in *Angola*, hoarding those facts in no way promotes the Progress of the useful Arts, the goal of copyright.  Dissemination of the facts contained solely in *Angola* "may well provide valuable source material for future biographers . . . or for historians or social scientists.  . . . [T]he arts and sciences should be defined in their broadest terms, *see Sampson & Murdock Co. v. Seaver-Radford Co.*, 140 F. 539, 541 (1st Cir. 1905), particularly in view of the development of the field of social sciences."  *Rosemont Enters., Inc. v. Random*

*House, Inc.*, 366 F.2d 303, 307 (2d Cir. 2966).  Indeed, as Justice Brennan explained, "[t]he arena of public debate would be quiet . . . if a politician could copyright his speeches or a philosopher his treaties and thus obtain a monopoly on the ideas they contained." *Harper & Row*, 471 U.S. at 582 (Brennan, J., dissenting) (quoting *Lee v. Runge*, 404 U.S. 887, 893) (1971) (Douglas, J., dissenting from denial of certiorari).

Furthermore, "[a]s with all works of authorship, the copyright owner secures protection only for the expressive content of the work, not the ideas or facts contained therein." *Salinger,* 811 F.2d at 95 (citing *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976)).  This distinction is "fundamental to copyright law and of special significance in determining whether infringement has occurred in a work of biography or other account of historical or contemporary events." *Salinger*, 811 F.2d at 95 (citing *Rosemont*, 366 F.2d at 306)).

In viewing *Angola*, a reasonable fact-finder could clearly see that there is little to no "expressive content" of the work; there is only what seemingly amounts to Fuentes' decision to turn the camera on or turn the camera off.  These are "home videos," and the Plaintiff has referred to them as such.  And in the absence of expressive content, Fuentes cannot claim copyright over the facts contained in *Angola*, especially in light of the fact that "[o]ne of the most important purposes to consider" in a fair use analysis "is the free flow of ideas—particularly criticism and commentary." *Suntrust Bank*, 268 F.2d at 1268.  Mega was perpetuating this free flow of ideas:   ideas that otherwise may have never come to light.  Therefore, this factor also weighs strongly against Fuentes and in favor of fair use.

### 3.    Amount and Substantiality of the Portion Used

The third factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," § 107(3) and asks whether "'the quantity and value of the materials used' are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quoting *Folsom*, 9 F. Cas. at 348).  The Court must focus upon whether "[t]he extent of . . . copying" is consistent with or more than necessary to further the purpose and character of the use.  *Id.* at 586-87; *see Sony*, 464 U.S. 417, 449-50 (reproduction of an entire work "does not have its ordinary effect of militating against a finding of fair use" as to home videotaping of television programs); *Harper & Row*, 471 U.S. at 564 ("[E]ven substantial quotations might qualify as fair use in a review of a published book or a news account of a speech" but not in a scoop of a soon-to-be-published memoir).

So the Court must look at the work appropriated, both qualitatively and quantitatively, in order to determine whether Mega's use was "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  Although the parties do not dispute that a total of 67 minutes and 22 seconds of video was shown during the five separate *Maria Elvira Live* broadcasts [D.E. 84], Fuentes states that "Defendants admittedly used 67 minutes and 22 seconds *of the content contained in Plaintiff's video*."  [D.E. 105]  Mega replied that they did not just allow sixty-plus minutes of footage from *Angola* to run over five nights.  At several times, the show broadcast images from *Angola* "and repeated these images, often dissecting the same image with different expert panelists."  [D.E. 111]  After viewing the episodes

in question, the Court finds that Mega's assertions regarding the actual amount of video shown are valid, although it is also true that many different scenes and footage were undoubtedly used in the broadcast.

Now, a determination of the numerator in this quantitative analysis means nothing without the denominator, and the parties disagree on that, as well. At the time of the broadcasts, Fuentes had, by his account, accumulated ten to twelve hours of video from his several trips to Angola. *See* Fuentes Depo. I at 83. At the time the Complaint was filed, Fuentes had only registered two hours of video as "*Angola 1988/1989*," and those two hours happened to contain every clip and scene that Mega used during its broadcasts of *Maria Elvira Live*. Even if, assuming *arguendo* for simplicity's sake, Mega had used 60 minutes of original *Angola* footage in its broadcasts (although in fact they likely used less), the proportion of footage used compared to the entirety of the footage increases drastically from 8.6-10% (based on whether one uses ten hours or twelve hours as the original denominator) to 50% (based on one using the two hours Fuentes registered). No reasonable juror could find Fuentes' selective registration of two hours of *Angola*—with no explanation ten months after the alleged infringement—as anything but an attempt by Fuentes to catch the Defendants in a copyright bind.

As for a *qualitative* judgment, Fuentes states that the Supreme Court has "directed a qualitative evaluation of the copying of the copyrighted work." [D.E. 105] at 14 (citing *Harper & Row*, 471 U.S. at 564-65). In other words, there must be an "evaluation of the qualitative nature of the taking." *Harper & Row*, 471 U.S. at

565.  In *Harper & Row*, Justice O'Connor found that "the Nation took what was essentially the heart of the book," *id.* at 564-65, when it cherry-picked powerful passages from Ford's manuscript.  She went on to state that "[t]he Nation article is structured around the quoted excerpts which serve as its dramatic focal points.  In view of the expressive value of the excerpts and their key role in the infringing work, we cannot agree . . . that the magazine took a meager, indeed an infinitesimal amount of Ford's original language."  *Id.* at 588 (citations and internal quotations omitted).

Although he has compiled a list of cases stating the general rule and finding against fair use based on the *quality* of the taking, *see, e.g.*, *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980), Fuentes makes no argument whatsoever about the qualitative value of the excerpts of *Angola* that Mega appropriated for its broadcasts.  If Fuentes chooses not to address the qualitative value of his own copyrighted material, then the Court is hardpressed to do so as well.  Even Fuentes' expert makes no contention that one set of scenes is any more valuable or newsworthy than other scenes.  Thus, on this record, there is precious little showing as to why these 60-minute scenes are the most important or fundamental than the overall 10-12 hours of videotape that Fuentes controls.

And the Court further finds that Mega indisputably used the quantity of scenes from *Angola* that it broadcast reasonably "in relation to the purpose of the copying," *Campbell*, 510 U.S. at 586—that purpose being the goal of "further[ing]

the dialogue and the continuing political and social debate regarding General Ochoa, General de la Guardia, and their trial and conviction." Gomez Report at 9.

In short, this third factor also weighs in favor of Mega and a finding of fair use, though not to the extent of the first two factors addressed above.

### 4.      Effect on the Market Value of the Original

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4).  The inquiry that the Court is asked to make considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting Nimmer § 13.05 [A][4] at 12-102.61 (footnote omitted)); *see also Harper & Row*, 471 U.S. at 569.

This factor must also be analyzed in light of whether the new use is "transformative" or merely "supersedes the original." *See On Davis v. Gap, Inc.*, 246 F.3d 152, 175-76 (2d Cir. 2001) (citation and quotations omitted).  "When a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591 (citation omitted).  However, we discussed above that Mega's use of *Angola* was, in fact, transformative, making it then less likely that market harm to the original *Angola* would occur.  Also tempering the "extent of market harm"

caused by Mega's original infringement is the fact that, up until that point, Fuentes had been utterly unsuccessful at licensing his Angola videos to anyone, whether it be Univision, the History Channel, or as part of any film project. *See supra*, at § I.B.

It is also entirely plausible that the broadcasts of *Angola* on *Maria Elvira Live* would spark public interest for any Angola- or Ochoa-related project that Fuentes could potentially create. *See Time, Inc.*, 293 F. Supp. at 146 (granting summary judgment to defendant on the question of liability where it appeared, *inter alia*, that a secondary, infringing publication "would, if anything, enhance the value of the copyrighted work"). Ultimately, though, in the light most favorable to Fuentes, the Court need not speculate about the market harm that could potentially occur if "'unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting Nimmer § 13.05 [A][4], p. 12-102.61 (footnote omitted)). There is some record evidence to support Fuentes' contention that the market value of his work has potentially been injured to some extent. We must draw that inference in Fuentes' favor on summary judgment.

Hence, this fourth and final factor is at equipoise or weighs only slightly in favor of Fuentes and against a finding of fair use.

### 5.    *Overall Conclusion to the Fair Use Analysis*

Having found that the fourth factor may weigh slightly in Fuentes' favor, the Court considers Fuentes' argument that the fourth factor is central to the fair use

analysis.  [D.E. 105]  *See Harper & Row*, 471 U.S. at 566, ("This last factor is undoubtedly the single most important element of fair use."); *accord* Nimmer § 13.05[A][4] at 13-183.  Historically this has been the case, but the Supreme Court appears to have retreated from this position in its more recent decisions.  *See Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 926 (2d Cir. 1994) ("*Campbell*'s discussion of the fourth factor conspicuously omits this phrasing.").  *But see Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1385 (6th Cir. 1996) (en banc) (calling the fourth factor "at least *primus inter pares*").  Rather than accord the fourth factor primacy, the Supreme Court has recognized that "the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors."  *Campbell*, 510 U.S. at 590 n. 21.

With this in mind, the Court considers balancing the amount of harm to Fuentes against the fact that the previous three factors have compellingly weighed in favor of the Defendants.  Clearly Fuentes has not had a strong showing on any of the factors other than the *potential* effect on the market value of the original.  That limited injury to the market value of the original, to the extent it exists at all, does not overcome the strength of the other fair use factors that strongly support Mega's position.  "The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and the Useful Arts would be better served by allowing the use than by preventing it."  *United States v. Am. Society of Composers, Authors, and Publishers*, 599 F. Supp. 2d 415, 423-24 (S.D.N.Y. 2009) (citations and

quotations omitted). Taking the determinations of all the individual factors into account—although they are by no means a "score card," *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 198 (3d Cir. 2003)—the Court concludes as a matter of law that Mega's use of *Angola* was a fair use pursuant to § 107. No reasonable jury could conclude otherwise. Thus Mega and the Defendants are entitled to summary judgment in their favor as a matter of law.

## III. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, it is hereby **RECOMMENDED** as follows:

1. Defendants' Motion for Summary Judgment [D.E. 83] should be **GRANTED** and judgment entered in Defendants' favor on the copyright infringement claim.

2. The Clerk should be directed to CLOSE this action and all pending motions, if any, should be **DENIED** as moot.

3. Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright* (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9th day of June, 2011.

_____
EDWIN G. TORRES
United States Magistrate Judge