UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 09-22979 CIV MORENO/TORRES

**NORBERTO FUENTES,**

Plaintiff,

vs.

**MEGA MEDIA HOLDINGS, INC. d/b/a
MEGA TV, SPANISH BROADCASTING
SYSTEM OF DELAWARE, INC., MES
PRODUCTIONS, INC.,
TELEMOTION PRODUCTIONS, INC.,**

Defendants.

_____/

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE TORRES'S REPORT AND RECOMMENDATION

Plaintiff, Norberto Fuentes, by and through his undersigned counsel, and pursuant to Fed.R.Civ.P. 72(b)(2) and 28 USCS § 636, files these Objections to Magistrate Judge Edwin Torres's Report and Recommendation dated June 9, 2011 (DE 142), in which the Magistrate Judge recommended granting summary judgment to Defendants on Plaintiff's copyright claim on the ground that Defendants' use constituted fair use under § 107 of the Copyright Act. In support hereof, Norberto Fuentes states as follows:

## PRELIMINARY STATEMENT

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure and 28 USCS § 636, Norberto Fuentes objects to the Report of Magistrate Judge Edwin Torres based on the numerous factual inaccuracies and improper legal conclusions, which permeate the report. As noted by Magistrate Torres, the affirmative defense of fair use is a mixed question of law and fact. (DE 142, p. 12). *Peter Letterese & Associates, Inc. v. World Institute of Scientology Enterprises, et al,*

1

533 F.3d 1287, 1307 (11th Cir. 2008). The factors to be considered in determining fair use of a work in a particular case includes: (1) the purpose and character of the use, including whether such use is of a commercial nature, or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for, or value of the copyrighted work. 17 U.S.C.§ 107. These four statutory factors are non-exclusive, and should not be treated in isolation from each other. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).

As demonstrated below, Norberto Fuentes respectfully submits that Magistrate Torres did not adequately address the four factors of the fair use defense, and therefore, erred in recommending that the Court grant Defendants' motion for summary judgment. Accordingly, the Court should decline to adopt the report and recommendation, and deny Defendants' motion for summary judgment.

## A.     **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 72(b), which governs dispositive motions referred to a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations" of a magistrate judge on a dispositive motion "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *see also,* S.D. Fla. Mag. R. 4(b). If objections are timely filed, the district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. *Id.* While the standard of review is *de novo*, a district judge need not re-assess every single finding and determination, for "the statute permits the district court to give to the magistrate's

proposed findings of fact and recommendations 'such weight as [their] merit commands and the sound discretion of the judge warrants' "without violating a party's due process rights, "so long as the ultimate decision is made by the district court." *U.S. v. Raddatz,* 447 U.S. 667, 683, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980) (citing *Mathews v. Weber,* 423 U.S. 261, 275, 96 S. Ct. 549, 46 L. Ed. 2d 483 (1976)).

Upon review of the magistrate's decision, the district judge may accept, reject, or modify the recommended disposition, receive further evidence, recall the witnesses, or return the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Further, a district judge does not abuse his discretion in either considering or refusing to consider an "argument that was not presented to the magistrate judge." *Williams v. McNeil,* 557 F.3d 1287, 1290-91 (11th Cir. 2009).

**B.    Plaintiff's Objections**

**1.    The Purpose and Character of the Use of Plaintiff's Work by Defendants Weighs in Plaintiff's Favor**

   **(a)    Does Mega's use of *Angola* fall into one of the enumerated categories under the copyright statute?**

The Magistrate Judge concluded that Defendant's use of Plaintiff's copyrighted material falls into the fair use categories of news reporting, comment and criticism enumerated in the copyright statute.  (DE 142, pp. 14-17).[1]  While Defendant's use of Plaintiff's work arguably

---

[1] Magistrate Torres opined in his report that "Fuentes faces a dilemma: either Angola is not newsworthy and thus there is no market that could have been damaged by Mega's use, or Angola is newsworthy, and there is no market..." (DE 142, p. 17).  This reasoning is unsound. Plaintiff maintains while Fuentes's material is marketable, it is not necessarily "newsworthy," and is analogous to a picture taken of Abraham Lincoln by a photographer just before he stepped into Ford's theatre.  (See DE 136-7 - Deposition of Joseph Gagen, pp. 147-148).  A photo of this nature is certainly has historical significance, and marketable, however, it would not be characterized as "newsworthy."  In fact, Maria Elvira Salazar confirmed in her deposition the

may fall into one or more of these categories, other factors in determining the purpose and character of the use by Defendants militate toward a finding that this factor weighs in Plaintiff's favor.

**(b)      Was Mega's use of *Angola* "transformative"?**

The Magistrate Judge also concluded that Defendant's use of Plaintiff's work in its broadcast programs is transformative. [DE 142, pp. 18-21].   However, Plaintiff respectfully submits that, at best, Defendants' television programs, in their use of excerpts from Plaintiff's *Angola* tapes in conjunction with interviews and discussion by guests, is minimal, and  therefore, insufficiently transformative.    The Report and Recommendation, as well as Defendants, acknowledge and emphasize that the historical character of the actions of General Arnaldo T. Ochoa, Colonel Tony de La Guardia, and General Patricio de la Guardia depicted in Plaintiff's *Angola* tapes were significant to Defendants' audience. [D.E. 142 at 15-16]; *See also*, Dr. Andy Gomez Report (Exhibit K to Defendants' Motion for Summary Judgment) at 7.   Defendants' television program, which used important portions of Plaintiff's copyrighted work as the centerpiece of discussions of Ochoa and the de la Guardia in these programs, do not alter the historical character of the material taken from Plaintiff's *Angola* tapes.   Indeed, they merely emphasize, rather than transform, the overall purpose of the Plaintiff's tapes. *See Letterese*, 533

---

material, while important, was not necessarily a current event.  Ms. Salazar asked during her deposition:
Q. What was the news, this important news?
A. Well, this video is full of important moments in the Angola war where the Cubans were very active in.  It had, most the images show Ochoa, which was the top Cuban general in the Angola war and the guy who was conducting that war, and it showed him in places and conversations and in different attitudes that made this video very important for the audience.  (DE 104-5, p. 106).
The fact this material was not newsworthy, does not diminish the market for, or interest in the material.  As such, Plaintiff submits Angola could be newsworthy, and there is a market for this historical material.

F.3d at 1311. Defendants' use, therefore, should more accurately be characterized as an unauthorized derivative work.

A derivative work, to which a copyright owner has exclusive rights, is defined as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted". 17 U.S.C. §§ 101, 106(2). As noted in *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 143 (2d Cir. 1998), although "derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works--unlike works of fair use--take expression for purposes that are not 'transformative.'" Since Defendants have adapted Plaintiff's expression into television programs with little, if any, transformative purpose, the first fair use factor weighs against Defendants. *See Castle Rock*, 150 F.3d at 143.

A work that is not transformative, and that merely supersedes the objects of the original creation, is less likely to be entitled to the defense of fair use because of the greater likelihood that it will supplant the market for the copyrighted work, fulfilling demand for the original. *Letterese*, 533 F.3d at 1310, *citing Campbell*, 510 U.S. at 579, 588. Further, the interaction of the factor of transformative use with the fourth factor of the fair use analysis, the effect on the market, which is discussed below, is not centered around 'whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work. The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original'. *Letterese*, 533 F.3d at 1311, fn 25.

Here, Defendants' use of Plaintiff's copyrighted work falls short of a transformative use, and it supplants the market for Plaintiff's work. A truly transformative work, for example, would have used excerpts from Plaintiff's videos in a movie featuring a fictional depiction of the lives of Ochoa and de la Guardia. *See Id.* at 1311 (discussion of difference between a transformative use and superseding use). Such was not the case with respect to the discussion of Fuentes' video.

(c)    **Was Mega's use of *Angola* commercial?**

In considering whether Defendants' use served a commercial purpose in his analysis of the purpose and character of Defendants' use of Plaintiff's copyrighted work, the Magistrate Judge found Plaintiff's argument in this regard unpersuasive. However, Defendants' unauthorized use of Plaintiff's work was clearly for a commercial purpose under the facts and the law. The facts indicate that Defendants stood to gain at least indirect commercial benefit in the form of increased ratings when it aired the five special episodes commemorating the twentieth anniversary of the executions by the Cuban government of General Ochoa and Colonel de la Guardia, a subject of interest in the Cuban community of South Florida. Further, Defendants' *Maria Elvira Live* is an intentionally controversial show. [DE 104-5, p. 40, lines 11-13].[2] The scenes from Plaintiff's work that Defendants selected and aired in several broadcasts were particularly provocative, as described in the Report and Recommendation. [D.E. 142 at 15-16] *See Roy Export Co. Establishment v. Columbia Broad. Sys. Inc.*, 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980) (noting that although CBS's broadcast of a tribute to Charlie Chaplin which included copyrighted film clips was not sponsored, CBS "stood to gain at least indirect commercial benefit from the ratings boost which it had reason to hope would (and in fact

---

[2] Although Maria Elvira Salazar was referring to a show named Polos Opuesto, which aired on Channel 22, she stated her show kept changing its name. Maria Elvira Live indeed has a substantially similar theme and purpose of Polos Opuesto. (DE 104-5, pp. 73-74).

did) result from the special"). Since Defendants' use is minimally transformative, the commercialism factor becomes more significant, and weighs against a finding of fair use. *See Letterese*, 533 F.3d at 1309-1310.

> (d)     **Did Mega act in good faith in their use of Angola?**

The Report and Recommendation rejects Plaintiff's argument that even if Defendants had acquired Plaintiff's *Angola* tapes in good faith, Defendants acted in bad faith when they continued to broadcast Plaintiff's material after being advised that they were infringing Plaintiff's copyright. [D.E. 142 at 26]. The Magistrate Judge quotes the statement that "If the use is otherwise fair, then no permission need be sought or granted. *Thus being denied permission to use a work does not weigh against a finding of fair use." Campbell*, 510 U.S. at 585 n.18 (citing *Fisher v. Deed*, 785 F.2d 432, 437 (9ᵗʰ Cir. 1986)) (emphasis added). Plaintiff respectfully submits that in the instant case, the factors of fair use weigh in Fuentes' favor, and permission therefore was necessary, and Defendants' continued broadcast of Plaintiff's copyrighted material after being notified of his copyright in the material was in bad faith.

Moreover, even if it is determined that Defendants acted in good faith, "since good faith does not insulate a defendant from liability and is merely a 'presupposition' of a defendant's claim to the defense, its existence here would not outweigh the commercial and superseding nature of defendants' use". *Letterese*, 533 F.3d at 1312. In the instant case, the existence of any good faith use is outweighed by the commercial nature of Defendants' use of Plaintiff's work, as well as the lack of a transformative use.

**2.      The Magistrate Judge Did Not Consider the Crucial Factor that Plaintiff's Work was Unpublished in Analyzing the Nature of the Work**

In determining the nature of Plaintiff's copyrighted work, the Magistrate Judge did not consider the crucial factor that Plaintiff's work was unpublished at the time that Defendants

appropriated his work. Works that are "'closer to the core of intended copyright protection,' and thus merit greater protection, include original as opposed to derivative works; creative as opposed to factual works; and *unpublished as opposed to published works* (emphasis added). *Letterese*, 533 F.3d. at 1312 citing *Harper & Row, Publishers, Inc., et al. v. Nation Enterprises et al.*, 471 U.S. 539, 551(1985)("Publication of an author's expression before he has authorized its dissemination seriously infringes the author's right to decide when and whether it will be made public, a factor not present in fair use of published works.").

Moreover, the Supreme Court in *Harper & Row* concluded that the fact that a plaintiff's work is unpublished is a factor tending to negate the defense of fair use. *Harper & Row,* 471 U.S. at 551. Further, "[t]he law provides greater copyright protection for unpublished works in recognition of the author's property interest in the 'commercially valuable right of first publication,' including the 'exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing,' ...and because of the author's 'personal interest' in 'creative or quality control'." *Letterese*, 533 F.3d at 1313, quoting *Harper & Row*, 471 U.S. at 562, 564, 555.

Although the *Letterese* Court considered the work at issue in that case to be "semi-factual", it also accorded great weight to the publication status of the work. *Letterese*, 533 F3d. at 1312 –1314. Here, there can be no doubt that Plaintiff's original work was unpublished at the time that Defendants appropriated it. [DE 104-1 - Fuentes Declaration].

In the instant case, regardless of whether Plaintiff's work is considered factual or creative, the fact that Plaintiff's work was unpublished is a key factor, which the Magistrate should have considered, and weighs strongly in favor of Plaintiff, and against the fair use defense.

Judge Torres found in his Report and Recommendation that Plaintiff's work is factual, with little expressive content, and asserts that "[i]f Fuentes is the only one with access to the facts in *Angola*, hoarding those facts in no way promotes the Progress of the useful Arts, the goal of copyright." [D.E. 142 at 29-30]. Plaintiff respectfully disagrees with this characterization, and submits that although the "public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts", the fair use doctrine "is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.,* 621 F.2d 57, 61 (1980) (citations omitted); *Harper & Row*, 471 U.S. at 558. [If one were to pursue the reasoning expressed by Judge Torres to its logical conclusion, the videotaping or photographing of newsworthy events would not be protected. As noted in *Los Angeles News Service et al. v.  Frank Tullo et al.,* 973 F.2d 791, 796 (9th Cir. 1992), "denying copyright protection to news pictures might defeat the ultimate First Amendment goal of greater public access to information by inhibiting or destroying the business of news photography" (citation omitted). ]

Further, the showing of Plaintiff's work in the five special episodes on *Maria Elvira Live* was not essential to Defendants' television presentations, since other visual material regarding Ochoa and the de la Guardia in Angola was available at the time. As cited in the Report and Recommendation, it appears from the record that other archival material besides Plaintiff's videotapes on the subject may be available to the public. [D.E. 142 at 25]. Therefore, considerations pertaining to the free flow of ideas and First Amendment issues do not preclude liability for infringement of Defendants' use of Plaintiff's copyrighted material. *See Los Angeles News Service,* 973 F.2d at 796; *Roy Export,* 503 F.Supp. 1137 (SDNY 1980) ("newsworthiness"

9

of material copied does not justify copying), aff'd, 672 F.2d 1095 (CA2), cert. denied, 459 U.S. 826 (1982).

### 3.   Defendants Appropriated "The Heart" of Plaintiff's Work.

The Report and Recommendation concluded that the third factor of the fair use analysis, the amount and substantiality of the portion of Plaintiff's work used by the Defendants, weighed in favor of Defendants, based only on the quantity of scenes taken from Plaintiff's *Angola* tapes. [D.E. 142 at 34].  However, in analyzing the amount and substantiality of the portion used, a court considers "not only . . . the quantity of the materials used, but . . . their quality and importance, too." *Campbell*, 510 U.S. at 587.

Copying even a small portion of a copyrighted work may exceed the boundaries of fair use if the material taken is the "heart" of the work. *See Los Angeles News Service,* 973 F.2d at 798, citing  *Harper & Row,* 471 U.S. at 564-65 ("while words quoted by copyright infringers were 'an insubstantial portion' of President Ford's unpublished memoirs, they were the 'heart of the book' in that they were among the most 'interesting,' 'moving' and 'powerful' passages"); *Letterese*, 533 F.3d at 1315 ("[t]he amount taken may be substantial from a qualitative perspective if the defendant has copied the 'heart of the book'").

Here, Defendants "cherry-picked" the most interesting and powerful scenes from many hours of Plaintiff's *Angola* tapes, including scenes described in the Report and Recommendation which show General Ochoa engaging in "sexually-charged" behavior, ridiculing an officer's request for air support in southern Angola, and dismissively throwing a Rolex watch into a pool. [D.E. 142 at 15-16, citing the Gomez Report at 7-8 and the Salazar Depo. at 148].

Regardless of how many minutes of footage Defendants used in proportion to the number of hours in the *Angola* tapes, the scenes used by Defendants were the "heart" of the footage in

the *Angola* tapes. *See Los Angeles News Service,* 973 F.2d at 798 (finding that although Defendant copied only a small part of footage shot by Plaintiff, it was the most valuable part, the "heart" of that footage, therefore finding against Defendant). Based on the record in this case, the quality and importance of the materials used by Defendants should have been considered in determining the factor of the amount and substantiality of the portion used. This factor weighs in favor of Plaintiff.

### 4.    The Effect of Defendants' Use upon the Potential Market for or the Value of Plaintiff's Original Copyrighted Work and Derivative Works is Emphatically Substantial and Harmful.

Judge Torres further concluded that the market value of Plaintiff's work has potentially been injured by Defendants' use of Plaintiff's work, and therefore, the fourth fair use factor of potential market harm to Plaintiff "is at equipoise or weighs only slightly in favor of Fuentes and against a finding of fair use". [D.E. 142 at 35]. However, this factor strongly favors a finding for the Plaintiff.

It bears repeating that the relevant statutory factor is "the effect of the use upon the *potential* market for or value of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). This factor applies to the potential market or value of "either the original work or derivative works". *Letterese,* 533 F. 3d at 1315; *Campbell,* 510 U.S. at 590 ("The enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works'", citing *Harper & Row,* 471 U.S. at 568). Further, the Court must consider two inquiries: (1) "the extent of the market harm caused by the particular actions of the alleged infringer," and (2) "whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market." *Letterese,* 533 F. 3d at 1315, citing *Campbell,* 510 U.S. at 590.

The Report and Recommendation addressed the potential adverse effect of Defendants' use on Plaintiff's "original" *Angola* tapes, but did not consider the likely effect on Plaintiff's potential derivative works. It should be noted that Defendants' television programs using excerpts from Plaintiff's copyrighted work are essentially derivative works of the type that Plaintiff himself would produce in potential derivative works of his own. Indeed, as set out in the Report and Recommendation, the facts show that Plaintiff planned to create or collaborate on projects using his *Angola* tapes in a documentary interview style similar to that created by Defendants. [D.E. 142 at 5-6].   Therefore, Defendants' television programs substitute for a derivative market that a copyright owner such as Fuentes "would in general develop or license others to develop." *Castle Rock,* 150 F.3d at 145, quoting *Campbell*, 510 U.S. at 592.  Because Defendants' programs borrowed exclusively from Plaintiff's works and not from any other sources, Defendants' programs are likely to fill a market niche that Plaintiff would in general develop. *See Castle Rock,* 150 F.3d at 145.

The Report and Recommendation asserts that "tempering the 'extent of harm' caused by Mega's original infringement is the fact that, up until that point, Fuentes had been utterly unsuccessful in licensing his Angola videos to anyone". [D.E. 142 at 34-35].  This implication that there was not a potential market for Plaintiff's work is inapposite.   "Even an author who ha[s] disavowed any intention to publish his work during his lifetime [is] entitled to protection of his copyright, first, because the relevant consideration [is] the 'potential market' and, second, because he has the right to change his mind." *Letterese,* 533 F.3d at 1317 (citations omitted).

Plaintiff is not required to prove that he has actually developed or will develop a market for his *Angola* tapes or derivative works; even if a plaintiff "has evidenced little if any interest in exploiting [a] market for derivative works . . . the copyright law must respect that creative and

economic choice." *Letterese*, 533 F.3d at 1317, citing *Castle Rock Entm't Inc.*, 150 F.3d at 145-46.

The Report and Recommendation also suggests that the broadcasts of Plaintiff's *Angola* tapes by Defendants might contribute to the market for Plaintiff's work. However, this overlooks the "crucial fact that the control of derivative works is part of a copyright owner's bundle of rights" and Defendants' broadcasts may be market substitutes for derivative works of Plaintiff's original work. *Lettersee*, 533 F.3d at 1318.

Since the Report and Recommendation did not reach the second inquiry regarding whether unrestricted and widespread conduct of the sort engaged in by the Defendants would result in a substantially adverse impact on the potential market, Plaintiff will not address it. However, based on the foregoing, the fourth factor strongly weighs in Plaintiff's favor.

## C.    Conclusion

For the foregoing reasons, viewing the record evidence and all reasonably factual inferences in a light most favorable to Plaintiff, as required by Fed.R.Civ. 56(c), it could not have been found by Magistrate Torres that there was an absence of any material fact. Accordingly, the Court should decline to adopt the Magistrate Judge's Report and Recommendation (DE 142), and deny Defendants' motion for summary judgment.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of June, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/EMF.

Respectfully submitted,

/s/ Richard J. Burton, Esquire
Richard J. Burton
Fla. Bar No. 179337
Richard J. Burton, P.A.
2999 NE 191st Street, Suite 805
Aventura, FL 33180
Tel: 305.705.0888
Fax: 305.705.0008
Email: rb@burtons.net